Argued November 16, 1939.
Angelo M. DeLisi filed his libel May 10, 1938, praying for an absolute divorce from his wife, Mary, upon the ground of indignities to his person. The master recommended a decree, but the court below sustained respondent's exceptions to the report and dismissed the libel. Upon the present appeal by the libellant our independent examination of the record has satisfied us the libel was properly dismissed.
The parties were married November 28, 1935, and lived with the respondent's parents at 2005 West Madison Street, Philadelphia, until December of 1937 when they established a separate home at 3050 North Hemberger Street, some four or five blocks distant. There *Page 442 
they lived until May 9, 1938. On that date they separated and this proceeding was instituted immediately.
Libellant is a barber, earning from $13 to $20 per week, excluding tips. During their married life he turned his salary over to respondent, who also worked continuously as a hosiery examiner. His hours of employment were from eight a.m. to eight p.m. and hers from seven until four.
The matrimonial experience of these young people was stormy. They were of Latin extraction; he had a nervous temperament and was excitable; she was emotional and somewhat addicted to the use of vulgar and profane language; and the interference of respondent's mother in their affairs furnished the background for many quarrels. These circumstances have a material bearing upon the case: Pugliese v. Pugliese, 136 Pa. Super. 121, 123,7 A.2d 41.
The excitable disposition of libellant was illustrated by the testimony of his brother relative to a general family quarrel at the home of the witness during which libellant threatened suicide. It is not suggested that respondent was responsible for the quarrel; the only reflection cast upon her is that she was not sufficiently attentive to libellant during his nervous attack.
No purpose would be served by a detailed recital of the testimony. Libellant's, for the most part uncorroborated, is full of generalities, with no specific fixing of the dates upon which various quarrels and alleged indignities took place. He testified respondent objected to preparing his meals at his mother-in-law's residence when he returned from work in the evening. There were arguments over meals, his coming home late, and money matters, in which the mother-in-law participated.
The first definite date of any serious quarrel given by libellant was about a week before Labor Day, 1937, nearly two years after their marriage. According to his testimony, respondent on that occasion, which was *Page 443 
his day off, refused to go to the movies with him. She did not call him to his supper until all the others were through and his meal was cold. When he refused to eat it she swore at him and his family and told him to "get the hell out to his father." Libellant packed his clothes and went to his father's home where he lived about a week. Respondent then came and talked to libellant outside the shop; he refused to live with her unless she would leave her mother and go to housekeeping. However, due to the fact respondent's father was then out of a job and no money was coming in, libellant agreed to go back and live again with his wife at the home of her parents. While there they paid $8 a week board.
Libellant testified "everything went smooth up until about . . . . . . the middle of December." Then, following an argument over a summons for illegal parking of their car by respondent, libellant refused to continue living with her parents. As a result respondent selected the house on Hemberger Street where they lived until their separation.
While they lived on Hemberger Street libellant said he continuously told respondent they would have to move farther away from her parents, but she insisted on staying near her mother, declaring she wouldn't leave her for libellant or any man. These arguments culminated in their separation. His statement was that as they separated respondent called him a "bastard", and "no prize bag", and expressed a wish that he might "drop dead".
Respondent denied much of libellant's testimony but admitted she had called him vulgar names upon several occasions before she knew their full meaning. The parties had several physical encounters during their quarrels. Libellant testified respondent frequently struck and scratched him. When asked by the master to fix definite dates libellant replied: "I couldn't even give you the approximate dates. It would happen at *Page 444 
her mother's house when we were living on Madison Street and of course the Hemberger address a few times." The assaults were not one-sided. Respondent testified: "I was only married one month and I got my first black eye over a simple argument. He just seemed to have a handy hand to hit me all the time." Libellant admitted he struck respondent "a couple times, maybe punched her once or twice."
In considering this testimony, all the circumstances of the case, including the position in life, education, training and disposition, of the parties must be borne in mind: LaClair v.LaClair, 128 Pa. Super. 469, 470, 194 A. 222; and Knox v.Knox, 109 Pa. Super. 45, 48, 165 A. 769.
Perhaps the testimony most nearly approaching proof of an indignity, recognized as such by our decisions (Secor v. Secor,126 Pa. Super. 561, 191 A. 647, and Fishman v. Fishman,134 Pa. Super. 217, 4 A.2d 543) was that of libellant in which he said, "She (respondent) always accused me of going out with other women, her and her mother. That is one thing I never did."
Respondent, when interrogated about this charge, testified: "Q. Did you at any time accuse him of running around with other women? A. Yes, I have. But that was only just to say; not that I really saw or heard anything. I just said that. Q. You didn't have any evidence that he was running around with other women? A. No. I didn't. Q. How often did you accuse him of doing that? A. I guess five or six times, maybe more. Q. Did these accusations lead to any serious quarrels between the two of you? A. About going out with other women? Well he said if you accuse me of doing it he would go ahead and do it, but we didn't have any serious argument about it."
No particulars were given by either party of the circumstances under which any of these accusations were made. That is the chief difficulty with the entire case. *Page 445 
Libellant's testimony is replete with general charges of improper conduct by respondent, without giving even approximate dates. Statements that respondent "always" or "continually" did certain things are of little value because vague and indefinite. As stated in Esenwein v. Esenwein, 312 Pa. 77, 80, 167 A. 350: "In considering whether there is that `clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce . . . . . . the court must be informed what the respondent has done; not what witnesses may conclude, or what they may regard as the character of the conduct': Edmond's App.,
supra, [57 Pa. 232]. General expressions `are of no value unless accompanied by the actual facts on which these assertions are based. We are entitled, in the consideration of the case, to have the particulars as to the words spoken or the things done that constituted the cause of action alleged': Ford v. Ford, 67 Pa. Super. 350,352; Bishop v. Bishop, 30 Pa. 412, 415."
In our opinion, those instances of alleged misconduct which were detailed and specific were not of such frequent occurrence as to constitute the "course of conduct" deemed essential by the law to support a decree.
"It is well settled, however, that it is not with isolated occurrences that the law concerns itself in determining whether a divorce should be granted upon this ground, but only with indignities, so repeated and continuous as to constitute a course of conduct which renders the complaining party's condition intolerable and life itself a burden: Esenwein v. Esenwein,
supra, [312 Pa. 77]; Dailey v. Dailey, 105 Pa. Super. 461,161 A. 475; Sharp v. Sharp, supra [106 Pa. Super. 33]. Such indignities, we have frequently said, `may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of *Page 446 
misconduct are not sufficient' Breene v. Breene, 76 Pa. Super. 568; Koontz v. Koontz, 97 Pa. Super. 70; Sharp v.Sharp, supra.": Mathias v. Mathias, 114 Pa. Super. 444,447, 174 A. 821.
Such incidents as libellant detailed, when considered in connection with respondent's explanations and denials, were not shown to have been entirely her fault and fall far short of establishing "imperious reasons" for a divorce. The testimony as a whole shows brittle tempers, arguments and disputes, in which both parties seem to have been about equally at fault. Its general tenor, although disclosing frequent quarrels and temporary flare-ups, seems to indicate there are no insuperable obstacles in the path of this marriage. Following their quarrels the parties quickly cooled and were reconciled. Typical is the instance, admitted by both parties, when respondent, after an argument at the Hemberger Street address, left and was locked out by libellant, only to be admitted again after her walk of a few minutes around the block had afforded time for the tempers of both to cool.
Respondent's conduct, even accepting libellant's testimony and ignoring her contradictions and modifications, did not amount to a "manifestation of that malevolent disposition and settled hate and estrangement upon [her] part which libellant was required to establish in order to maintain his action": Mathias v. Mathias,
supra, at page 449.
As libellant failed to establish a case of indignities by that degree of clear and convincing proof which the law requires(Dailey v. Dailey, 105 Pa. Super. 461, 466, 161 A. 475;Sleight v. Sleight, 119 Pa. Super. 300, 308, 181 A. 69) the court below did not err in dismissing the libel.
Decree affirmed. *Page 447