Scholl, Appellant, *v.* Scholl.

Argued October 3, 1944. Before KELLER, P. J., BALD-RIGE, RHODES, HIRT and JAMES, JJ. (RENO, J., absent)

*Calvin F. Smith,* with him *William S. Hudders,* for appellant.

*Orrin E. Boyle,* with him *Lewis R. Long,* for appellee.

OPINION BY KELLER, P. J.:
This was an action for divorce from bed and board brought by Catherine Abel Scholl against her husband, Roy F. Scholl, on the grounds of cruel and barbarous treatment and personal indignities. The master recommended that the divorce be granted on both grounds. The court sustained exceptions to his report and dismissed the libel. The libellant appealed.

We have carefully read and considered the testimony and are in substantial agreement with the master, who had the advantage of seeing and hearing the witnesses testify, as to their credibility. Our considered judgment, after reviewing all the evidence, is that the respondent was guilty of such cruel and barbarous treatment as to have endangered his wife's life, and that she is entitled to a divorce from bed and board on that ground, with an allowance of permanent alimony.

Accordingly, we are not called upon to decide whether he was also guilty of such a course of conduct by way of indignities to her person as to render her condition intolerable and her life burdensome. However, his actions in that respect may be considered in connection with his cruel and barbarous conduct towards her, and we agree with the master that they show a condition of settled hate and estrangement towards his wife. It is proper to take this into consideration in passing upon the evidence relating to his cruel and barbarous conduct, for it sheds light on whether his conduct was intentional or accidental.

The evidence necessary to support a decree of divorce on the ground of cruel and barbarous treatment differs from that required for a divorce because of indignities to the person. For the latter, the evidence must establish a *course* of conduct or continued mistreatment such as to render the libellant's condition intolerable and life burdensome: *Esenwein v. Esenwein,* 312 Pa. 77, 79, 167 A. 350. But a single instance of cruelty to the wife may be so severe and with such attending circumstances of atrocity as to justify a divorce, provided it endangers her life or warrants a reasonable apprehension thereof, and renders further cohabitation unsafe. See *Lowe v. Lowe,* 148 Pa. Superior Ct. 439, 444, 25 A. 2d 781, 784, and the cases therein cited.

The respondent's conduct towards his wife on July 11, 1940 was so cruel, barbarous and atrocious as rea-

sonably to warrant not only apprehension by her that her life was endangered, but also to justify the conclusion on our part that if she had not escaped from him and gone to the neighbors for protection, the consequences would probably have been fatal to herself or her unborn child, or both.

The story as told by Mrs. Scholl—and along with the master we accept her version as the true one, and much more probable than his—was that shortly after 12 o'clock noon her husband came home from his work, as an assistant superintendent of the Bethlehem Steel Company, and found her feeding her sixteen months' old baby girl. He regularly took his lunch at the works, and in fact had but few of his meals at home with his wife—frequently taking them at his parents' home nearby. He said, "Eating again?" She replied, "Not I, but the baby." He went into the living room, picked up a book, 'Matched Pearls', by Grace Livingston Hill, that was on the stand, and said, "When did you buy this?" She said, "Look inside and you'll see." He said, "This is trash, just as you are." He threw the book down on the stand, and then went upstairs and came down and went to the basement. He made more than one trip to the basement while she was feeding the baby. She then carried the baby upstairs and was about to take off its dress when he said, "Don't take her dress off. I'll take care of her this afternoon." This was unusual, but she said nothing. She put the baby down in her crib, gave her a bottle of milk and pulled up the side of the crib, so she wouldn't fall out. Her husband took her arm and said, "You're coming with me now!" He had hold of her right arm and right hand and pulled her down the steps to the first floor and then down the cellar steps to the cellar. She was pregnant and had been for six months, and he knew it, for he had wanted her to have an abortion committed and she had refused, and he resented it, saying she had

"double-crossed" him and done it for spite. She said to him, "Where are you taking me? What are you doing? What are we going to do?" To which he replied, "I'm going to finish you this time." When they got to the cellar he kicked her in the abdomen twice. (He had kicked her in the abdomen when she was pregnant before, with the little girl, after he had taken her to Newark to have an abortion performed, and the doctor there had refused to perform it because the foetus was too far advanced, and had recommended them to go to a New York doctor; and he then called her 'yellow' because she had refused to go ahead with it.) She struggled to get away from him and screamed. He took a towel that hung by the laundry tubs and tried to force it into her mouth, evidently to stop her cries. In her struggle to take the towel out of her mouth and get away from him, she got on the floor and he got on top of her, holding her down by his knees. He said, "I'm going to finish you this time." Once, when she got the towel from her mouth, she asked him not to kill her. He said nothing, but got off her body and stood at the foot of the stairway. She got up from the floor and walked over to the laundry tubs. She asked him what he had done to her mouth; it felt so large and hurt so. He said that was nothing compared to what he was going to do. She glanced towards the outside cellar door and saw there was no bar across the short beam of light that came through. She was about midway between her husband and the door—possibly 15 feet from each. She ran to the door, pushed it up, ran out into the yard and called for help. She ran over the yard towards Sixth Avenue and as she was running across the street a neighbor, Mrs. Estella Shafer, came across and led her to her porch, told her to sit down and got her some water. Mrs. Scholl's mouth was swollen badly, and was aching and bleeding. The blood was running down from her mouth on her dress. She was very excited, and

told Mrs. Shafer that her husband was going to kill her. It was a spontaneous declaration, uttered within a few seconds after the occurrence and while she was still affected by it, excluding all premeditation and design, and was properly admissible as part of the res gestae. The respondent came across the street five or six minutes later and told his wife to go back home, that she belonged over there. She said she was afraid to go unless some one went with her, and after awhile another neighbor, Mrs. Gangawere, went along home with her. Later that day, accompanied by her sister, who came for her, she left for her parents' home in Bath, Pa., taking with her her two children, a boy 11 years old and the 16 months' old baby, and has lived there ever since. On July 29 and 30 she took her furniture away from the house. The court says "she cleaned out the house entirely with the exception of a clock upon the mantle, a radio and his clothing which was strewn upon the floor." She had a right to take away the furniture. She had bought and paid for all of it with her own money, earned as a school teacher.

The husband's story, of course, was entirely different. According to him, he had asked her to go down to the cellar with him and he had pointed out to her some soiled diapers on the cellar floor and had told her that this had to stop; that she had started to run for the open cellar door, he chasing her, and she had fallen on the cement steps and cut her mouth. He denied that he had used any force on her or had any struggle with her, and said that she herself had disarranged her hair and torn her dress. However, the cross-examination of the libellant by the respondent's counsel, long before he went on the stand and told his story, is most revealing. The cross-questions he asked her were evidently inspired by the respondent, and they strongly tended to corroborate the libellant's story of a physical struggle between them in the cellar.

"Q. [by Mr. Long] You had many diapers around that day, didn't you? A. No, I had done the laundry ...... Q. You had soiled clothing up and down the cellar steps, didn't you? A. No. Q. Did you have any in the basement? A. I had two diapers on the floor, at the foot of the cellar steps. Q. You threw them down? A. Yes. Q. Any diapers upstairs in the bathroom? A. No. Q. Any soiled clothing in the bathroom? A. Possibly, some in the hamper. Q. None laying around that it would be in the way of a person? A. No. ...... Q. You followed him down [to the cellar] didn't you? A. He took me down. Q. Who went first? A. He did. He pulled me by the hand. Q. You followed in back of him? A. Yes. ...... Q. What did he say, when you were following him down the steps, hand in hand? A. 'I was going with him.' Q. What did he say? A. He said, 'You are going with me.' ...... Q. Then you said you had no words between you? A. No quarrel. Q. No quarrel? A. Not at that time, no. Q. He didn't say anything to you? A. He was going to finish me. 'I'm going to finish you this time.' Q. What did you do? A. I tried to struggle away from him. Q. Isn't it a fact that he told you, 'The same conditions are around here, as they were twelve years ago?' A. No. Q. You made no mention of that either in your direct examination? A. I don't remember that. Q. Well did he strike you? A. He kicked me in the abdomen. Q. He did? A. Yes. Q. When? A. When he had me in the cellar. ...... Q. Were you standing, facing him, when he kicked you? A. He was still holding my hand. Q. What were you doing? A. I was trying to free myself. Q. *You flew at him, like a tigress,* didn't you? A. Probably, after he kicked me. Q. You didn't try to grab him, and shake him, and scratch his eyes out? A. No. Q. You didn't fly at him first? A. No. Q. You didn't swing on your husband, before anything happened? A. No. Q. And

you didn't get down to the floor at any time of this scuffle, did you? A. Yes, I was on the floor. Q. When? A. In trying to free myself from him, I got to the floor. Q. How did you get to the floor? A. My husband had his arm around my neck, holding his [my?] body so that he could work a cloth into my mouth, and that weakened my knees, and I dropped. Q. He was holding you up by the neck, but yet you dropped to the floor? Is that right? A. Well, yes. Q. And then when did he kick you? A. While I was standing. Q. While you were standing, and he had you by the neck? A. No. Q. Then he put you away from him, so he could kick you? Is that right? A. He still had me by the hand. Q. He raised up his leg and kicked you with his shoe? A. Yes. Q. Did you kick him? A. No. Q. You didn't use your feet on him? A. No."

The testimony of Mrs. Scholl was supported by Mrs. Gangawere and Mrs. Shafer, two of the neighbors, who first came to her aid and found her with dress ripped and torn in the back, very swollen lips, bleeding at the mouth, and in a very excited condition, crying that her husband was trying to kill her. Mrs. Shafer said that Mr. Scholl looked like a mad man when he came over to her house and demanded that his wife come back. "I'll give you fifteen minutes to come back," he said; that she (the witness) then and there called him a brute and told him that he wouldn't let a dog be so abused in this condition.

The story told by the libellant was either true or it was a complete fabrication. There is no middle ground between them. And the impression made by this highly excited, injured woman, apprehending fatal results to herself and her unborn child, upon the neighbors who saw her immediately after she emerged from the cellar bleeding and screaming for help, and upon the doctors who were called at once to attend her, is properly to be taken into consideration in passing upon the truth

or falsity of her story. And they all were impressed by its truth and sincerity. If she had been acting a frame-up, they would have detected it.

The court below felt that Mrs. Scholl was discredited as a witness because she said that, although she was a graduate of a Teachers' College, she had not understood the meaning of the technical word 'acknowledgment' in connection with a deed that her husband induced her to sign conveying to his parents the house which the libellant and respondent owned as tenants by entireties and were living in, by representing that it was a mortgage necessary to raise money. The court, however, did not discredit respondent's testimony when he, a graduate of Lehigh University, said that he did not know what 'subject to' meant, when used in connection with the deed conveying the above real estate 'subject to' a mortgage. Such trivialities are of no weight in appraising the truth or falsity of the testimony in this case.

The respondent is a heavy, powerful man. He must be of ungovernable temper if he can work himself into a passion of this kind because his wife had left a couple of soiled diapers on the cellar floor where they would be handy to the laundry tubs when she washed them the next day; especially, since, although he was financially able to employ domestic help, he expected her alone to do all the cooking, laundry and cleaning incident to the house as well as care for two children, one of them a baby.

That he had no more affection for his children than he had for his wife is shown by the fact that when on April 1, 1929 his wife left his parents' home, where they had been residing, and went to live with her parents at Bath, Pennsylvania, a few miles away, taking her baby son with her, he never came to see his son for more than seven years; and that he wanted her to get rid of his two younger children before they were born, by abortion, and resented it because she refused to do so.

Further discussion is unnecessary. We are convinced that the wife's account of what happened on July 11, 1940 is substantially correct, and that the occurrence that day justifies a decree in her favor. The respondent was very lucky that the consequences were no worse.

The respondent is earning, by way of salary and bonus or incentive, about $6,000 a year. He is already under court order to pay for the support of his two older children the sum of $80 per month and $5 per week for the support of the baby born October 15, 1940, after libellant's departure to her parents' home. He is also under court order issued by the Court of Quarter Sessions of Northampton County to pay her $80 per month for her own maintenance and support. In order to avoid any conflict of jurisdiction and amount, we shall fix her permanent alimony at $80 per month.

The decree of the court below is reversed and the record is remitted with directions that a decree be entered granting the libellant, Catherine Abel Scholl, a divorce from bed and board from her husband, Roy F. Scholl, on the ground of cruel and barbarous treatment, and that he pay her permanent alimony of $80 per month, pursuant to section 47 of the Divorce Law of 1929, **P. L. 1237.**

PER CURIAM, January 25, 1945.

The foregoing opinion had been prepared by **President Judge KELLER** before his death on January 16, 1945. It is now adopted and filed as the opinion of the Court.