Rankin *v.* Rankin, Appellant.

Argued April 12, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*Wray G. Zelt, Jr.*, with him *George I. Bloom, Milton D. Rosenberg*, and *Bloom, Bloom & Yard*, for appellant.

*J. Lee Miller*, with him *Harvey A. Miller, James L. Jack, Jr., Miller & Miller*, and *Tomb & Tomb*, for appellee.

OPINION BY WRIGHT, J., July 17, 1956:

On February 3, 1953, Michael J. Rankin instituted an action in divorce against his wife, Edith L. Rankin. The parties were at that time aged 58 and 43 years, respectively. The complaint originally alleged cruel and barbarous treatment and indignities to the person, but was subsequently amended to include a charge of desertion. After rules for a bill of particulars, and for alimony pendente and counsel fee, were determined, the lower court, on April 5, 1954, appointed a master. On January 3, 1955, the master filed his report recommending a decree on all three grounds. Following the filing of exceptions and argument thereon, the lower court dismissed the exceptions and, on October 10, 1955, entered a final decree. This appeal followed.

Certain facts are not seriously in dispute, and are thus summarized by President Judge CREPS: "The parties were married in West Virginia on July 4, 1942. It appears that they knew each other for a period of about ten years prior thereto. Until about two months before the marriage, defendant, a registered nurse, had been employed as assistant superintendent of Ellwood City Hospital, Ellwood City, Pennsylvania, in which position she received a salary of $110.00 per month, plus room, board and laundry. Some two months prior to the marriage, defendant went, at plaintiff's request, to Clarksburg, West Virginia, where she enrolled in a business school, agreeably to plaintiff, to the end that she would be able to assist plaintiff, who could neither read nor write, in the operation of his coal stripping business which he had established in 1938.

Following defendant's attendance at business school for about two months, the parties were married. After the marriage, they lived for a time at the Gore Hotel, Clarksburg, West Virginia, and later they successively resided at Lost Creek, West Virginia, Johnstown, South Fork and Windber, all in Pennsylvania, and in the latter part of 1944 they moved to Washington County, Pennsylvania, to a farm of about one hundred acres with a large house containing ten or eleven rooms thereon which had been bought by plaintiff and title taken in his name; later, however, the title was vested in plaintiff and defendant as tenants by the entireties. In the meantime, plaintiff rather successfully conducted his coal stripping business, defendant acting as bookkeeper, and following their removal to the farm, plaintiff was necessarily away from home during the week, returning over weekends, and defendant performed her duties in an office located in the farm home. In the early part of 1947 a partnership consisting of plaintiff, defendant and defendant's father was formed for the conduct of the coal business. In 1948 a corporation was formed which took over the assets of the partnership, the stock in said corporation being held as follows: Plaintiff—519 shares; defendant—480 shares, accountant for the company—the remaining 1 share. That the marriage of the parties, particularly after they moved to Washington County, was not harmonious is clearly derived from the evidence in the case".

Before discussing the marital disputes and the causes alleged for the divorce, we deem it appropriate to make some observations concerning the master's report. While the recommendations of the master are entitled to careful consideration, they are advisory only and are not controlling either upon the lower court or

upon this court: *Philo v. Philo,* 154 Pa. Superior Ct. 563, 36 A. 2d 833. See also *Friess v. Friess,* 156 Pa. Superior Ct. 38, 39 A. 2d 151. We are required to consider the evidence de novo, pass upon its weight and upon the credibility of witnesses, and reach an independent conclusion upon the merits: *Huston v. Huston,* 130 Pa. Superior Ct. 501, 197 A. 774. And see *Rinoldo v. Rinoldo,* 125 Pa. Superior Ct. 323, 189 A. 566. We must sedulously examine and weigh the record to discover inherent improbabilities in the stories of the witnesses, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehood and other factors by which credibility may be ascertained: *Silfies v. Silfies,* 168 Pa. Superior Ct. 421, 79 A. 2d 130. If the record discloses no sound basis for rejecting the master's conclusions as to credibility, founded upon his observation of the demeanor and appearance of the witnesses, we are warranted in accepting his findings: *Smith v. Smith,* 157 Pa. Superior Ct. 582, 43 A. 2d 371. On the contrary, where the master's conclusions as to credibility are at variance with the record, his findings are entitled to little consideration: *Micheals v. Micheals,* 65 Pa. Superior Ct. 464.

The master in the instant case unqualifiedly accepted the testimony of appellee and his witnesses, and uniformly rejected the testimony presented by appellant and her witnesses. Speaking of appellee, the master says: "From a careful observation of his demeanor on the witness stand, your Master is convinced that his testimony is entitled to credence." A similar comment accompanied his review of the testimony given by Mrs. Mollie Leathers, Harry Hickman, and Mrs. Nora Stambaugh, all witnesses for appellee. Speaking of appellant, the master says: "Accordingly, your Mas-

ter attaches no credibility to defendant's testimony as
it relates to the alleged grounds for divorce". After
reviewing the testimony of Laura Powers, a sister of
appellant who testified briefly and was not cross-ex-
amined, the master says: "Regardless of the truth or
falsity of this testimony, I am convinced that it does
not possess any probative value". It is difficult to
follow the master's reasoning in this connection since
Miss Powers testified that she saw appellee threaten
appellant with a gun, that she saw Mrs. Rankin after
she had been beaten by appellee, that her arms were
injured, her knees bruised, and she had a black eye.
James Morrison, Pastor of the Beallsville Presbyterian
Church and a close neighbor of the parties, testified
that he had heard appellee speak disrespectfully of his
wife, that he had heard appellee say that if his money
would save him he would kill his wife, and that he saw
Mrs. Rankin when her face was "beat up". The mas-
ter says of this witness: "Without regard to the truth
or falsity of this testimony, your Master is of the opin-
ion that it possesses no particular probative value."
Speaking of Mrs. Catherine Reeves, a witness for ap-
pellant, the master says: "From a careful observance
of her demeanor and manner while testifying, your
Master is convinced that her testimony is not entitled
to credence". As to the testimony of Mrs. Florence
Mills, the master "attaches no credibility to her testi-
mony as it relates to the alleged grounds for divorce".
Similarly as to Mrs. Mary L. Hickman, the master
gave "no credence to this testimony as it relates to the
alleged grounds for divorce." Dr. John A. Krosnoff
testified extensively concerning his treatment of ap-
pellant for injuries to her back, and also concerning
an operation performed as a result of a herniated disc.
The master dismisses this testimony by saying: "Since

I have found as a fact that plaintiff did not physically abuse defendant, no further consideration of this testimony is necessary." In *Dash v. Dash,* 357 Pa. 125, 53 A. 2d 89, Justice (later Chief Justice) DREW said: "We have carefully considered all the evidence and we cannot agree with the Master's findings of fact and recommendation. We think he was over-persuaded by libellant, of whose credibility we have serious doubts." The language of the learned Justice applies even more forcibly in the case at bar.

Considering first the question of cruel and barbarous treatment, we note that the master was "of the opinion that this ground has been established by clear and satisfactory evidence." However, the lower court said: "We have some doubt as to whether there is sufficient in the case to sustain the cause of cruel and barbarous treatment". The term cruel and barbarous treatment comprises actual personal violence or a reasonable apprehension thereof, or such a course of treatment as endangers life or health and renders cohabitation unsafe: *Hurley v. Hurley,* 180 Pa. Superior Ct. 364, 119 A. 2d 634. A single instance of cruelty may be so severe, and with such attending circumstances of atrocity, as to justify a divorce: *Scholl v. Scholl,* 156 Pa. Superior Ct. 497, 40 A. 2d 897. The master bases his recommendation solely upon an incident which allegedly occurred when the parties were riding together in an automobile. As related in the master's report: "On one occasion, while they were riding in a car with defendant driving, she stated: 'I am going to kill you, you son of a bitch', and proceeded to drive the car at a high rate of speed. On this occasion plaintiff succeeded in slowing down the car by turning the ignition key, following which he jumped from the car; thereupon defendant, attempted to run him down." This

circumstance was categorically denied by appellant, was entirely uncorroborated, and is utterly improbable in the light of appellee's testimony that he "jerked the key out to slow the car down", that he got out of the car, and that appellant then "turned the car" and endeavored "to get me along the road".

Next considering the question of indignities, the findings of the master which the lower court deemed important may be thus summarized: Appellant's "attitude toward plaintiff was one of marked antipathy; she called him vile and opprobious names without provocation"; she refused to have children; she "had the furniture, with the exception of the box springs and mattress, removed from plaintiff's bedroom"; she "was frequently absent from the home without explanation . . . spit in his face and tried to strike him with a chair; that she threw hot water on plaintiff; and another time threatened him with a butcher knife". The lower court also considered the alleged incident in the automobile in connection with the charge of indignities, citing *Phipps v. Phipps*, 368 Pa. 291, 81 A. 2d 523. Appellee testified that his wife had him arrested "a lot of times" for assault and battery. It should be here noted that much of appellee's testimony consisted of similar general expressions and was vague and indefinite throughout. See *DeLisi v. DeLisi*, 139 Pa. Superior Ct. 440, 12 A. 2d 468; *Gross v. Gross*, 165 Pa. Superior Ct. 532, 69 A. 2d 190. Sidney A. Grubbs testified that, at the insistence of appellee, he went to see appellant in an effort to effect a reconciliation, but appellant said "there was no use to try to get along with that dumb hunky". Mollie M. Leathers testified that she frequently heard appellant use profanity and remark that she hated to see her husband come home. Harry Hickman testified concerning the removal of

the bedroom furniture, and the use of profanity by appellant. Nora Stambaugh testified that appellant once took the keys to the truck, denied having them, but finally threw them on the floor.

As we pointed out in our opinion filed this day in *Moyer v. Moyer*, 181 Pa. Superior Ct. 400, 124 A. 2d 632: "In a proceeding for divorce on the grounds of indignities, it must clearly appear from the evidence that the plaintiff was the injured and innocent spouse". In addition to the cases therein cited in support of this settled proposition, see also *Vergoni v. Vergoni*, 175 Pa. Superior Ct. 522, 107 A. 2d 144; *Soper v. Soper*, 178 Pa. Superior Ct. 182, 112 A. 2d 420; *Oliver v. Oliver*, 172 Pa. Superior Ct. 600, 94 A. 2d 124; *Wilson v. Wilson*, 163 Pa. Superior Ct. 546, 63 A. 2d 104; *Carter v. Carter*, 166 Pa. Superior Ct. 499, 72 A. 2d 621. In *Anthony v. Anthony*, 160 Pa. Superior Ct. 18, 49 A. 2d 877, Judge (now President Judge) RHODES said: "In order to determine whether a particular libellant is an 'innocent and injured spouse,' the court must not only examine and weigh the evidence relating to the many complex factual situations which make up the total picture of marital conduct, but it must evaluate this evidence with relation to the defenses available to the respondent in connection with the particular grounds for divorce relied upon by the libellant". It is well established that indignities provoked by the other party do not constitute ground for a divorce, unless the retaliation is excessive: *Esenwein v. Esenwein*, 312 Pa. 77, 167 A. 350; *Quieti v. Quieti*, 166 Pa. Superior Ct. 53, 70 A. 2d 437; *McGuigan v. McGuigan*, 178 Pa. Superior Ct. 176, 112 A. 2d 440.

In her testimony appellant admitted using profanity and calling her husband names. By way of explanation, she alleged that she had acquired her knowl-

edge of profanity from appellee, and that, in calling her husband "a dumb hunky", she was only repeating his own words. She flatly denied that she ever threw hot water on him, or threatened him with a butcher knife. With regard to the removal of the bedroom furniture, she testified that she and her husband had purchased a new bedroom suite. In anticipation of its delivery she and Mrs. Hickman removed the furniture, excepting the mattress and springs, from one bedroom. Before the suite could be delivered appellee cancelled the purchase. The outstanding incident about which appellant testified was a quarrel which took place while the Hickmans were living in the Rankin home. Appellant's story is that she fell to the floor, whereupon her husband stepped upon her applying his full weight to her back. This is corroborated by Mrs. Hickman who testified that she was in the kitchen when she heard a commotion upstairs and appellant ran downstairs with her husband in pursuit. As appellant came into the kitchen she fell and appellee "kicked her and stepped on her". The witness went to call her husband and, when she returned, appellant was sitting on a chair and appellee was hitting her on the head with a belt. The master apparently chose to treat this entire incident as a fabrication, despite the fact that corroboration came, inter alia, from two unimpeachable sources. The one was James Morrison, the minister neighbor of the parties. The other was Dr. John A. Krosnoff, appellant's family physician, who testified that he treated appellant for multiple bruises, particularly of the left side of the face, a large swelling on the head, and bruises of the hip and back. When appellant's condition failed to improve, the doctor advised an x-ray examination which disclosed the herniated disc. A surgeon then performed an operation on

appellant's spine which did not cure her condition. She is still undergoing treatment and is unable to work. On another occasion appellee pulled appellant from her chair and threw her out of the house. Appellant thereupon called the police and had appellee arrested for assault and battery. The charge was subsequently dropped. In answer to appellee's charge that she refused to have children, appellant testified that in 1949 it was necessary for her to undergo a hysterectomy. This was corroborated by Dr. Krosnoff, who referred appellant to Dr. Fisher for the operation. Catherine Reeves and Florence Mills, two other witnesses for appellant, testified that appellee frequently used vile language toward his wife. Both testified that appellant was a good cook and a good housekeeper, and that she tried to get along with her husband. As already noted, several witnesses testified that appellee threatened to kill his wife. When asked if he had not said that he "would like to shoot that God Damn Crummy", appellee's reply was: "I don't know if I did or not."

The fact that married people do not get along well together does not justify a divorce: *DeFrancesco v. DeFrancesco,* 179 Pa. Superior Ct. 106, 115 A. 2d 411. See also *Boyles v. Boyles,* 179 Pa. Superior Ct. 184, 116 A. 2d 248. Testimony which proves merely an unhappy union, the parties being high strung temperamentally and unsuited to each other and neither being wholly innocent of the causes which resulted in the failure of their marriage, is insufficient to sustain a decree: *Garroway v. Garroway,* 163 Pa. Superior Ct. 317, 61 A. 2d 379. If both are equally at fault, neither can clearly be said to be the innocent and injured spouse, and the law will leave them where they put themselves: *Albrecht v. Albrecht,* 176 Pa. Superior Ct. 626, 109 A.

2d 209. At the very best, appellee's evidence might establish such a situation. A less favorable view of the evidence indicates that appellee was the principal offender, and that appellant was actually the innocent and injured spouse. In neither event has appellee established his right to a divorce on the ground of indignities.

Coming finally to the charge of desertion, in the words of the lower court, the "type of desertion" in the case at bar is "sometimes loosely and inappropriately called 'constructive desertion' ". Appellee testified that, on the day he left home,[1] he and his wife had an argument; that appellant's father and brother subsequently came to the house; that he refused to admit them; that they left the premises but later returned; that he (appellee) was then in his car; and that the father and brother pursued him for ten or fifteen miles. Appellee finally arrived in Windber, where he had a room, and never lived in Washington County again. He testified further that he returned on two occasions to get some clothes; that he gained admission the first time with his key, but did not get all his clothes; that when he returned for the remainder the locks had been changed and his wife threw his clothes out to him. The master found that this testimony was sufficient to establish desertion by the wife, saying: "While the testimony brings the case within the category of 'constructive desertion', a somewhat vague concept in Pennsylvania jurisprudence and one of limited application, it is nevertheless clear that desertion may be said to exist where the plaintiff has been wilfully and maliciously put out of the common habitation by force

---

[1] The date set forth in the amendment to the complaint was October 12, 1951. However, in his testimony, appellee was not certain of the month, or even of the year, much less the exact date.

or justifiable fear of immediate bodily harm, or locked out against his will and without his consent".

In *Reiter v. Reiter*, 159 Pa. Superior Ct. 344, 48 A. 2d 66, Judge (now Mr. Justice) ARNOLD enunciated certain rules for guidance in considering "this type of case where the guilty spouse extrudes the innocent spouse from the common habitation".[2] He said, "In the type of desertion now discussed the libellant must be wilfully and maliciously put out by force or justifiable fear of immediate bodily harm, or locked out against the will, and without the consent, of the innocent spouse". That such a situation was not established in the instant case was in effect conceded by the master, who said, "it cannot be concluded that plaintiff was wilfully and maliciously put out of the common habitation by force or by justifiable fear for there is nothing to indicate that the father and brother, in chasing plaintiff by automobile, were acting at the request or direction of the defendant". Nevertheless, the master concluded "that plaintiff was locked out of the common habitation against his will for his failure to return was based, not on a lack of desire to return, but upon fear of harm from defendant's family". But we have not found a scintilla of evidence to support the proposition that appellee failed to return because of fear of harm from his wife's family. Moreover, we have searched the record in vain for evidence of an actual desire on appellee's part to return to the home.

---

[2] By the dissents in *Dukenfield v. Dukenfield*, 177 Pa. Superior Ct. 215, 110 A. 2d 858, and *Zorn v. Zorn*. 177 Pa. Superior Ct. 219, 110 A. 2d 860, it was hoped to bring about a review, and preferably the elimination, of the doctrine of constructive desertion. However, an allocatur was refused in the *Dukenfield* case, and in the *Zorn* case, while an allocatur was allowed and reversal followed, the rules laid down in the *Reiter* case were expressly approved. See *Zorn v. Zorn*, 382 Pa. 319, 114 A. 2d 907.

On the contrary, the testimony shows that he was satisfied with the separation. That appellee was not interested in a reconciliation is indicated by a letter to his wife dated July 2, 1953, reading in part as follows: "You say you want to talk to me. I don't have anything to talk about . . . The most it will cost me now is $1,000.00 to get rid of you". An alleged desertion is reduced to the status of separation if the deserted spouse manifests his consent. See *Totino v. Totino,* 176 Pa. Superior Ct. 108, 106 A. 2d 881.

In our view of the case, it is unnecessary to pass upon appellant's contention that the lower court erred in refusing to permit the introduction, as after discovered evidence, of the record of appellee's prior divorce action in Clarion County. We conclude by emphasizing that a divorce decree must be founded upon compelling reasons, and upon evidence that is clear and convincing, *Wasson v. Wasson,* 176 Pa. Superior Ct. 534, 108 A. 2d 836, which necessary essentials are not disclosed by this record.

The decree of the lower court is reversed, and the complaint in divorce is dismissed.