**Bass *v.* Bass, Appellant.**

Argued December 15, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Harvey N. Schmidt,* with him *Oscar N. Gaskins,* and *Schmidt & Gaskins,* for appellant.

*J. P. Shein,* with him *Edwin Seave,* for appellee.

OPINION BY WOODSIDE, J., April 12, 1962:

This is an appeal from a decree of the court below granting a divorce to the husband on the ground of indignities.

The case involves no legal problems. The applicable principles of law have been repeated so often that it is useless to restate them. To decide this case, we must examine the record and apply the established principles of law to the evidence before us.

The plaintiff is a 35 year old osteopathic physician married to the 32 year old defendant since June 4, 1951. They have one child born April 4, 1954. Shortly after the marriage, the plaintiff began his studies at the Philadelphia College of Osteopathy, from which he was graduated in June, 1955. After serving a year as an interne at Metropolitan Hospital, he began the practice of osteopathy in July, 1956. The parties separated in September, 1959. From these bare facts, one immediately suspects that this case may fit into the all too familiar pattern of the wife who slaves, saves and sacrifices so that the man whom she loves may realize his highest potentialities, and when the fruits of her efforts are realized, the husband rejects her and bestows them upon another.

This case seems different. The doctor was a poor boy, and for a time he received financial assistance from his wife. But from the beginning of his college career, she did little to encourage him. When he started college, he was employed full time as a night postal employe. When the time came that he was unable to continue his full-time employment and also carry on his exacting college work, his wife attempted in numerous ways to discourage him and to prevent the continuation of his college work. His wife taunted him with, "Why didn't you take care of your wife the way other men do?" He was "a stupid bastard," and "no damn good." When they were unable to meet the expenses of their apartment and had to move to other quarters, she left him and stayed away for three months. He took her back; she left again; again he took her back. She became pregnant and urged an abortion, and when the plaintiff refused, she left him again. He took her back again, and then, in addition to his college work and a part-time job, he washed her clothes, made the meals and looked after her. After the child was born, she

said she was "through" and left again, but again came back.

The defendant used the vilest possible language. It is difficult to imagine such a repertoire of vulgar expressions as the record shows was used by the defendant against her husband. Nothing pleased her; she complained of everything. The indignities were not limited to words. She snatched his glasses from his face and threw them to the floor and tried to trample them. When in a rage, she left their home and broke every window in their parked automobile. On another occasion, while he was driving and she was on the back seat, she hooked her umbrella around his neck and when warned by him of the danger, she said, "I don't give a damn what I kill, as long as I kill you."

Times changed; the stress of poverty passed; the doctor prospered, but the defendant's conduct did not improve. The parties moved into a nice house. They vacationed in Atlantic City. The wife had a mink stole and a vicuna coat. He gave her a $2500 ring. She threw it on a cupboard with the remark, "This is nice, but there are a lot of other things I could use beside the damn ring."

The wife's vulgarity continued. She refused to prepare his meals at the times necessary to enable him to keep his office hours. She was disrespectful to his patients. She accused him of having sexual relations with his patients. She objected to his accepting calls out of his office. She scratched his face with her finger nails so that he had scars for three months. She tore off his pajamas in the presence of their daughter and kicked him in the groin. She struck him with a table lamp, and she threatened to kill him. He lost weight, developed an ulcer and finally left her. Now the ulcer is better, his weight is up and his health is improved.

As would be expected in a contested divorce, the wife's version of their marital life differs materially

from the husband's version. She did leave him a number of times—to spend time with her two illegitimate children who were staying with her mother,—and she did break all the windows in their automobile, but most of the other accusations, she says, were false. She did not use vulgar language, except maybe "hell and damn." She was the one who was abused. Her husband beat her many times, she said. Since 1958, he ran around with other women.

There are over 1500 pages of testimony, and from the verbosity it is difficult to separate the wheat from the chaff. There is much more that could be related and discussed. Basically, the decision must rest upon credibility. The master, who had an exceptional opportunity to observe and judge the parties, was certain in his conviction that credibility was with the plaintiff. The reading of the record by the court below brought it to the same conclusion. Our reading of the record leads us to follow them. Counsel in his brief admits that "There is no question but that there are inconsistencies in the defendant's testimony," and that "she did lose her temper."

The plaintiff is a strong, young man six feet tall and his wife a very short girl. If he had beaten her in the manner she described, he undoubtedly would have injured her, but she said that she didn't bruise easily, and being a negro bruises would not show readily, and that she never needed medical attention. Only a few weeks before the divorce action was brought, she remarked that she had no grounds for divorce. She now argues, however, that the plaintiff is not an innocent spouse because of his abuse of her. We agree with the master and the court below that the evidence does not support her contention.

She charges that her husband committed adultery. The evidence does not support the charge. The evidence indicates that he was involved with at least one,

and possibly more, women but practically all of the evidence related to events following the separation and fell far short of establishing adultery. Even if he had committed adultery after the separation, it would not be a ground for refusing a divorce on the ground of indignities. *Ristine v. Ristine,* 4 Rawle 460 (1834); *Clark v. Clark,* 160 Pa. Superior Ct. 562, 566, 52 A. 2d 351 (1947).

Decree affirmed.