## Pasternak *v.* Pasternak, Appellant.

Argued September 18, 1964. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Frank F. Truscott,* with him *Philip B. Driver, Jr., Otis W. Erisman,* and *Truscott, Kline, O'Neill & Howson,* for appellant.

*Charles E. Rankin,* with him *Rankin & Rankin,* for appellee.

OPINION BY WATKINS, J., November 12, 1964:

In this action in divorce a.v.m., instituted by the husband-appellee, Stanley J. Pasternak, against the wife-appellant, Mary Adelaide Pasternak, on the ground of indignities to the person, the master recom--

mended that the complaint in divorce be dismissed. The Court of Common Pleas of Delaware County sustained the husband's exceptions to the master's report and awarded a decree in divorce. This appeal followed.

The parties were married on October 21, 1944 in Beach Haven, Ocean County, New Jersey. They have resided together at various addresses in Pennsylvania and were residing on Mary Lane, Broomall, Delaware County, Pennsylvania, when they were separated on December 20, 1961. The husband was 45 years of age and is employed as an engineer at the Westinghouse Electric Company; the wife was 50 years of age and is employed as a secretary with the same company. There are no children.

It is true that the report of the master is entitled to great consideration in that he has heard and seen the witnesses and we have so held on numerous occasions, *Fiorilli v. Fiorilli*, 202 Pa. Superior Ct. 529, 198 A. 2d 369 (1964); and that it should not be lightly disregarded, but however, it is advisory only and the reviewing court is not bound by it and it does not come to the court with any preponderate weight or authority which must be overcome. The reviewing court must consider the evidence de novo, its weight and the credibility of the witnesses. The master's report is not controlling either on the lower court or upon the appellate Court. *Rankin v. Rankin*, 181 Pa. Superior Ct. 414, 124 A. 2d 639 (1956).

We must, therefore, examine this record de novo, consider carefully the master's report and at the same time give great weight to the opinion of the court below wherein this evidence was already considered de novo and the credibility of the witnesses carefully examined in view of the master's report.

After a careful study of this record we are convinced that the court below properly granted the de-

cree and we adopt the resume of the evidence contained in the opinion of the court below and upon which the decree was based on the ground of indignities to the person. This resume reads as follows:

"The evidence discloses that the parties were married in 1944 shortly after the husband entered the United States Navy. During the period that the husband was serving in the Navy the defendant wife lived with her mother. Although this may have seemed like a good arrangement at the time it was the starting point for the decline of this marriage due to the fact that the defendant wife never did sever her mother's apron strings. The serious indignities complained of by the husband did not commence until 1955. However, prior to that time and from the inception of the marriage there was a mother-in-law problem due to the wife's desire to be with and look after her mother. Although the wife had other brothers and sisters who could have shared the burden of looking after the mother, the wife assumed that entire burden. As the marriage grew older it became more and more evident that the wife preferred the company of her mother to that of her husband. In May of 1948 when the couple purchased a home in Folsom, Pennsylvania, the wife's mother moved with them. When the husband was required to go to another city for employment the wife refused to move with him but remained with her mother. When the parties went on vacation, the wife's mother went with them. When on vacation the wife preferred to accompany her mother to the beach rather than go with her husband. In fact wherever the parties would go, whether it be shopping or trips, the wife's mother always would accompany them. When the husband complained about this, the defendant wife told him that she and her mother would go without him. At one point the husband remarked to his wife that he understood her desire to be consid-

erate toward her mother but it seemed to him that she was missing the whole point of their marriage because she was much closer to her mother than she was to her husband. He further informed her that he would not continue to play second fiddle to her mother to which she replied that she could always get another husband but she would only have one mother. The preference of the wife for her mother led to many bitter arguments which increased in their intensity as the wife refused to alter her attitude and thereby caused an irretractable gulf in their relationship.

"In 1954 the division of Westinghouse in which the plaintiff was employed moved from Lester to Kansas City. The employer requested the husband to move to Kansas City but the wife did not wish to leave the Philadelphia area. The husband therefore attempted to arrange a transfer to another division of Westinghouse nearer the Philadelphia area. Without taking a lower salary and a lower classification, the husband was able to arrange a transfer of his position to the Atomic Power Division of the Westinghouse Corporation in Pittsburgh, Pennsylvania. The husband requested his wife to accompany him to Pittsburgh but she refused to do so. Many arguments ensued which resulted in the wife leaving the common bedroom and sleeping with her mother in a separate room from the latter part of 1954 until the husband actually went to Pittsburgh in May of 1955. During this period indignities became more pronounced. In the fall of 1954 during one of the arguments the wife pushed the husband plaintiff's cigar into his face and ashes and embers went all over him and all over the couch on which he was sitting. Some of the embers lodged in the couch and caused a fire for which the wife then blamed the husband. After the husband had used a glass for a drink of water in the kitchen, all glasses were removed from the kitchen and stored away; dirty

dishes used by the husband for dinner were put on the porch unwashed; all dishes were taken from the kitchen except a few which were old and cracked; all the furniture in the television room which the husband used was removed except the television set; all kitchen chairs were removed to the basement except the one which was left in the kitchen for the husband's use; all dining room chairs were removed and stored in the attic and dead insects were found in his bed. On numerous occasions the defendant referred to her husband as a 'dirty son-of-a-bitch' and a 'bastard Polack'. She told him he was a fairy, a queer, and accused him of having sex relations with his mother. On one occasion addressing her mother she said: 'Come on Mom, get a knife and we'll finish this damn Polack once and for all'.

"The husband went to Pittsburgh but the wife defendant would not follow him. He made many invitations for her to join him before he left and also after he left by letters addressed to her. The only communication he had from his wife were bills she wished him to pay. During his Pittsburgh stay, the plaintiff made visits to the Broomall property and in September of 1955 while making one the wife begged him to take her back. The husband then looked for a house in which to live in Pittsburgh and found a number which he thought would be suitable. However, the defendant wife always found excuses for turning them down.

"In an endeavor to preserve the marriage, the plaintiff arranged a transfer to the Philadelphia area by taking a reduction in classification and a loss in salary. This finally occurred in February of 1957 and the parties lived amicably together until the fall of that year. Again arguments commenced over the mother-in-law and, when the wife refused to do anything about her relationship with her mother, the par-

ties again occupied separate bedrooms. From this time on the husband was subjected to various harassments. These included the wife hiding his shoes by stuffing them behind the radiators, turning the lights on in his room while he was asleep and setting the thermostat in their house at 85 degrees and opening a window thereby overheating the house. On one occasion she tore off the husband's bed clothing and threatened 'I'll stick a knife in your ribs and you'll make headlines'.

"The relationship between the defendant and the husband's mother was the extreme opposite of that between herself and her own mother. Her attitude was such that she did not even wish to see her husband's mother. On one occasion when her mother-in-law was coming to visit the parties she locked and bolted the door. On another occasion when the mother-in-law was visiting she threw pots, pans and dishes around the kitchen breaking them. Although she was in a separate room she was heard shouting: 'I'll take the gun and shoot the dirty bastard'. She made many accusations concerning the morality of her mother-in-law. Her ridicule even extended to the husband's family. She told her husband that his mother and sisters were bitches and whores and that he was a queer and a fairy. These remarks were not limited to the plaintiff's ear alone, but were made before fellow employees and friends of the plaintiff. On one occasion after ridiculing the plaintiff, the defendant wife picked up a broomstick and hit the plaintiff about the ribs, the shins and pushed his pipe into his mouth.

"The indignities committed by the wife were varied and manifested a settled hate and estrangement toward her spouse. After the plaintiff had an automobile accident the defendant wife was heard saying: 'Dear Jesus let him crash on the road next time and

bleed to death in the gutter'. She accused him falsely of running around with another woman and also cast insults at his friends. She called these friends queers and accused one in front of his fiancee of having associations with a married woman. As a result of an argument concerning the dampness in the basement of their home, the defendant smashed every window in the basement with a broomstick. Following a dispute over the disposal of trash, the wife threw garbage and other trash over their lawn daily. When the husband complained to her about this action she replied: 'You're used to living in shit because you were brought up in shit, your mother didn't even teach you to wipe your ass, your mother was a sneaky dirty bitch and she drove your father to his death'. On several occasions the wife tore down the husband's clothes which he had hung to dry. On one occasion when he was arranging food packages of like brands to put in the freezer she hit him with a broom, punched him with her fist, spit on him, grabbed his private parts and called him a queer. On still another occasion the wife took an axe and chopped the hull of a boat owned by the plaintiff and others. During one altercation she told the husband he didn't know what he was to do on the honeymoon which provoked the husband into saying that she certainly did because she was a whore. As a result of this she beat his head with her fists, raising a welt on top of it and beat on his glasses. An altercation pertaining to the dog running loose ended with the wife hitting the husband with the shovel. On another occasion during an argument over clothing, the wife picked up a three feet long scraper weighing three pounds and struck the husband a number of blows on the head as well as on the hands, knuckles and knees. This caused a large welt to appear on his head and caused his forehead, knees and legs to bleed.

"On December 20, 1961, the day the plaintiff left the common domicile, a radio in the wife's room commenced playing at full volume at 5:30 a.m. The husband went to the wife's bedroom and turned it down. The wife who was in the bedroom came after him while he was leaving and tried to kick him. As she did so he caught her leg causing her to fall back against the wall. The husband went down the stairs to the first floor. When he reached the dining room his wife overtook him brandishing a knife with a blade about 9 inches long. She rushed at him with the knife stopping at a point one foot from him and with the knife pointed at his stomach yelled: 'I'll kill you, I'll kill you'. The husband tried unsuccessfully to take the knife from her and ran to his bedroom locking himself in. He left the house after the wife had gone to work and did not return to live at their house."

The court below commented that the master indicated that neither party told the truth but accepted the wife's story as more credible. Our conclusion is the same as the court below that the husband was worthy of belief in that many of his charges were corroborated by other witnesses and in some instances by the wife herself. She admitted picking up a fireplace scraper and of having a knife in her hand on the day of the separation. Credibility was resolved in favor of the husband by the court below and this Court as a result of a careful study of the record de novo and the course of conduct related by the husband and his witnesses disclose that she subjected him to a combination of utter contempt, a designated preference of her mother to the detriment of the marital relationship, disdain, neglect, vulgarity, ridicule, temper tantrums, violence and a clear manifestation of the settled hate and estrangement which constitute indignities to the person as defined by this Court in a long

line of cases. *D'Alessandro v. D'Alessandro,* 187 Pa. Superior Ct. 194, 144 A. 2d 445 (1958).

We agree also with the court below that the husband was an innocent and injured spouse; that the indignities were not provoked by the husband but that the wife was the initiating irritant. The husband, as in most cases, was not without fault and "we do not mean to pose him as a paragon" but neither are we called upon to balance mutual delinquencies but rather to determine which party is least open to the charge of causing the situation. *Bass v. Bass,* 198 Pa. Superior Ct. 10, 14, 179 A. 2d 674 (1962); *DiTroia v. DiTroia,* 202 Pa. Superior Ct. 7, 11, 193 A. 2d 877 (1963).

Decree affirmed.

WRIGHT, J., would reverse and dismiss the complaint as recommended by the master.