369 A.2d 1314

**Robert J. RILEY, Sr., Appellant,**

v.

**Helen W. RILEY, Appellee.**

Superior Court of Pennsylvania.

Argued March 8, 1976.

Decided Dec. 15, 1976.

Application for Allocatur Denied
May 11, 1977.

Henry O. Heiser, III, Gettysburg, for appellant.

Jesse L. Crabbs, Hanover, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

In this appeal appellant-husband, Robert J. Riley, contends that the court below erred in dismissing his complaint in divorce. On May 8, 1973, appellant filed a complaint alleging that his wife, Helen W. Riley, had offered such indignities to his person as to warrant a divorce a. v. m.[1] Although appellee was properly served she neither filed an answer nor entered an appearance. However, at the master's hearing on September 6, 1974, appellee appeared and contested the action, but without the benefit of counsel. The master found in favor of appellant and recommended that the divorce be granted. The lower court, upon reviewing the testimony, overruled the findings of the master and dismissed appellant's complaint. From this dismissal the husband has appealed.

The parties were married in Hanover, Pennsylvania on June 25, 1949. Eleven children were born of this union,

1. Divorce Law, Act of May 2, 1929, P.L. 1237, § 10, as amended. Act of March 19, 1943, P.L. 21, § 1; 23 P.S. § 10.

six of whom are under the age of eighteen and reside at home in the custody of appellee-wife. At the time of the master's hearing, appellant was 47 years of age and his wife 48.

Appellant testified that in the fall of 1972 the alleged indignities of his wife became so intolerable that he removed himself from their marital abode. Specifically, appellant testified that the following conduct of his wife compels the dissolution of their marriage: her false and constant accusations of infidelity, her approbrius name-calling such as "dirt" and "scum," her frequent neglect to prepare appellant's meals, her rare completion of the family laundry chores, her lack of affection and employment of the silent treatment, and her interruptions of his work and arguments with him in front of his fellow workers. He further testified that he awakened one night and found his wife pointing a firearm at his head. In addition, appellant stated that upon returning from a convention in Georgia he found his bedroom in such a state of disarray that he slept in the family camper. Not long thereafter, he left the family residence at the alleged request of his wife and daughter.

Appellee presented another picture. She admitted that on occasions she called appellant names. She further acknowledged that there were times when she did not have meals prepared, but that this was usually because she was occupied with the six children and her other considerable household duties. She conceded that in the volatile period preceding their estrangement she and her husband would not speak to each other for extensive lengths of time. She explained, however, that this was due principally to the fact that appellant was rarely at home and viewed his family obligation as confined simply to putting food on the table. If these were indeed the circumstances, it is hardly surprising to find a want of affection in the marriage. Nor is it difficult to understand why the family laundry was never totally finished, considering the size of the family. Appellee explained that

the bedroom was torn up because it was in the process of being painted. She denied ever having told appellant to leave, and stated that when appellant informed her he was going to leave, she replied that if that was what he desired, then he should leave. She categorically denied the incident with the firearm and speculated that her husband may have imagined the episode since he was drinking that evening. Appellee acknowledged the fact that she often accused appellant of unfaithfulness, but maintained that her suspicions were reasonably justified.

Appellant testified that since he left his family his disposition has improved and things have progressed so well at his primary job that he has received a raise. Appellant's witness, a former co-worker, confirmed the change in appellant's nature after the separation and, additionally, verified that appellee had on occasion interrupted appellant at work and engaged him in domestic arguments.

Appellant argues that the court below erred in two instances: (1) in concluding that the evidence was insufficient to sustain a claim of indignities, and (2) in further holding that he was not an innocent and injured spouse. Upon review, we find no error.

It is firmly established that it is our duty to make a plenary review of the record and independently determine whether the plaintiff has established sufficient grounds for a divorce. *Dougherty v. Dougherty,* 235 Pa.Super. 122, 339 A.2d 81 (1975); *Sells v. Sells,* 228 Pa.Super. 331, 323 A.2d 20 (1974); *Griffie v. Griffie,* 220 Pa.Super. 461, 289 A.2d 198 (1972). Furthermore, as we have previously observed:

"It is true that the report of the master is entitled to great consideration in that he has heard and seen the witnesses and we have so held on numerous occasions, *Fiorilli v. Fiorilli,* 202 Pa.Super. 529, 198 A.2d 369 (1964); and that it should not be lightly disregarded, but however, it is advisory only and the reviewing

court is not bound by it and it does not come to the Court with any preponderate weight or authority which must be overcome. The reviewing Court must consider the evidence de novo, its weight and the credibility of the witnesses. The master's report is not controlling either on the lower court or upon the appellate Court. *Rankin v. Rankin,* 181 Pa.Super. 414, 124 A.2d 639 (1956).

"We must, therefore, examine this record de novo, consider carefully the master's report and at the same time give great weight to the opinion of the court below wherein this evidence was already considered de novo and the credibility of the witnesses carefully examined in view of the master's report." *Pasternak v. Pasternak,* 204 Pa.Super. 339, 341, 204 A.2d 290, 291 (1964).

■ When attempting to determine whether a claim of indignities has been established, it is important to recognize that "[n]o general rule can be formulated as to what constitutes indignities in a particular case; such matters depend upon all the circumstances of a particular case . . . ." *Margolis v. Margolis,* 201 Pa.Super. 129, 133, 192 A.2d 228, 230 (1963). See also *Sells v. Sells,* supra. It has frequently been held, however, that "[i]ndignities may consist of vulgarity, unmerited reproach, habitual contumely, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement." *Martin v. Martin,* 154 Pa.Super. 313, 317, 35 A.2d 546, 548 (1943). See also *McKrell v. McKrell,* 352 Pa. 173, 42 A.2d 609 (1945); *Gehris v. Gehris,* 233 Pa.Super. 144, 334 A.2d 753 (1975); *Sells v. Sells,* supra; *Margolis v. Margolis,* supra. Furthermore, "[t]he very essence of the offense [of indignities] is a course of conduct or treatment which, by its continuity, renders the condition of the innocent party intolerable and his or her life burdensome." 2 Freedman, *Law of Marriage*

*and Divorce in Pennsylvania* § 308 (2d Ed. 1957). See also *Phipps v. Phipps,* 368 Pa. 291, 81 A.2d 523 (1951), cert. denied 342 U.S. 942, 72 S.Ct. 554, 96 L.Ed. 701.

More specifically, it is well settled that continuous and false accusations of infidelity accompanied by other humiliating or degrading behavior will sustain a claim of indignities. *Yohey v. Yohey,* 205 Pa.Super. 329, 208 A.2d 902 (1965); *Politylo v. Politylo,* 173 Pa.Super. 223, 95 A.2d 241 (1953); *Anderson v. Anderson,* 172 Pa.Super. 527, 94 A.2d 104 (1953).

Appellee does not deny that for several years prior to the 1972 separation she frequently accused appellant of infidelity. Appellee maintains, however, that her accusations were reasonably founded upon her husband's suspicious conduct. In *Thornton v. Thornton,* 168 Pa.Super. 391, 77 A.2d 691 (1951), we held that accusations of infidelity will not constitute indignities, even though the accusations are false, if they were made with reasonable grounds for believing them to be true. In short, where suspicions have been reasonably aroused, a claim of indignities on the basis of false accusations of infidelity will not prevail. *Coon v. Coon,* 173 Pa.Super. 60, 95 A.2d 344 (1953). Appellee's suspicions were nurtured by the fact that appellant rarely returned home until the early hours of the morning. Appellant testified that his later hours were necessitated by his second job.[2] It appears, however, that appellant was in the habit of keeping late hours regardless of whether or not he was actually working at night. In this connection, appellee and her 22 year-old daughter testified that if appellant was ever needed in an emergency he usually could be located at the "Vets, the Eagles, or Hankey's." Furthermore, appellant never rebutted appellee's testimony that she found lipstick on his face. Nor did appellant contra-

2. Appellant was employed full time as a mechanic and moonlighted at sundry jobs in the evening.

dict appellee's testimony that, subsequent to their estrangement, appellant returned home [3] to make a household repair and, in the words of appellee, stated: "Why don't you do like I do. Why don't you go out with whomever you please. Do like I did, give up the church, you don't need to go to church, give up the church and you can go with whom you please. . . . " Appellee further testified that her husband also advised her at this time that he had struck up a meretricious relationship with his best friend's wife, which appellant denied. Although this is not direct evidence that appellant was involved in illicit affairs prior to the separation, it certainly is "relevant to shed light on prior existing conditions." *Spray v. Spray*, 185 Pa.Super. 407, 412, 138 A.2d 189, 191 (1958). In the final analysis then, we are of the opinion that although none of the aforementioned incidents taken alone would justify accusations of infidelity, when collectively viewed these facts reasonably support appellee's charges. Accordingly, we conclude that appellant failed to establish his claim of indignities by clear and satisfactory evidence.[4] See *Regan v. Regan*, 227 Pa.Super. 552, 322 A.2d 711 (1972).

Order affirmed.

HOFFMAN, J., files a dissenting opinion in which WATKINS, President Judge, joins.

SPAETH, J., files a dissenting opinion.

HOFFMAN, Judge, dissenting:

On October 11, 1974, a master recommended that the court grant a divorce a. v. m. in favor of appellant,

3. Appellee also testified that on this occasion appellant engaged in marital relations with her. This fact alone does not preclude appellant from obtaining a divorce, but it belies his position that the conduct of his wife amounted to such indignities that his condition was intolerable. See *Klimkosky v. Klimkosky*, 167 Pa.Super. 116, 74 A.2d 497 (1950).

4. Since we have concluded that the evidence was inadequate to support a complaint of indignities it is, therefore, unnecessary to address appellant's relation contention that the lower court erred in finding that he was neither an innocent nor injured spouse.

plaintiff-husband. On December 5, 1974, the lower court found that appellant presented insufficient evidence of "indignities",[1] and dismissed appellant's complaint. Appellant contends that the lower court erred in so holding.

The parties separated in 1972, when appellant moved out of their rented farmhouse in Fairfield, Adams County. On May 8, 1973, he filed his complaint in divorce. A master was subsequently appointed and a hearing was held on September 6, 1974. The master filed a report on October 11, 1974, in which he recommended that the court grant a divorce a. v. m. However, on December 5, 1974, the lower court entered an order denying the divorce and dismissing the appellant's complaint. This appeal followed.

The following facts were developed at the master's hearing: Appellant and appellee were married in 1949. During the marriage, the couple had eleven children, six of whom were minors and still resided with appellee. The appellant is an auto mechanic who held two jobs to support his family during much of the marriage. The master made the following findings:

"15. Defendant has repeatedly made false accusations and charges of adultery so repeatedly made as to constitute a course of treatment.

"16. Defendant has made false and unjustified charges that the Plaintiff was infected with venereal disease.

"17. Defendant has verbally vituperated the Plaintiff by her calling the Plaintiff 'dirt', 'skum', 'rat', 'no good', and by her continued verbal condemnation of the Plaintiff to relatives of the Plaintiff and the Defendant and in front of the children of both the Plaintiff and the Defendant.

"18. There were extensive periods of time when the Defendant would not speak to the Plaintiff."

1. Act of May 2, 1929, P.L. 1237, § 10(f); as amended; 23 P.S. § 10(f).

As summed up in the lower court's opinion:

"The plaintiff's complaints were that his wife called him such names as 'dirt,' 'scum,' and 'rat'; that she seldom made breakfast for him; that two or three times a week his supper was not ready; that his wife gave him the 'silent treatment'; that his wife was not a satisfactory housekeeper; that his wife withheld sexual privileges from her husband; that he awoke one night to find his wife pointing a gun at his head; and that his wife frequently accused him of unfaithfulness, sometimes in the presence of others. He said the condition was intolerable and when he returned from a convention in 1972 and found the bedroom all torn up, he slept in a camper. Shortly thereafter, he said his wife and daughter told him to leave and he did."

The lower court found that appellant had produced insufficient evidence to prove indignities or to prove that appellant was the innocent and injured spouse. The court analyzed the facts as follows: "Certainly it is true that the names the wife admitted calling her husband were not complimentary, but this Court has heard far worse in divorce cases. Significantly, there was nothing in the testimony which demonstrated vulgarity on the part of the defendant, there was no malignant ridicule and no humiliating treatment that we can observe, except for the arguments which the plaintiff's witness says he observed on occasion, although he couldn't remember any names that were called 'or anything.' As for 'hatred,' it was the plaintiff who said he 'hated' to go home. There is nothing in the plaintiff's testimony to indicate that it was any great pain or hardship for him to leave the family. Only his wife complained of her 'hurt' and the 'hurt' to her children  .  .  . .

"As we perceive the situation here, the plaintiff has fathered 11 children, five [sic] of whom he now expects his wife to maintain. He says he's feeling much better now and one can hardly doubt that he does feel much

better. He does not have the day-to-day responsibility for raising the five children who remain at home on the assumption that his responsibility is discharged by his 'generous' financial contribution to the support of the family. Notwithstanding current trends, which are very much to the contrary, somewhere, somehow, married persons must be held to the responsibilities and commitments they assumed and made to one another in the dim distant past when they married one another for 'better or worse.' "

Section 10 of the Divorce Law [2] provides that " . . . it shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, whenever it shall be judged, in the manner hereinafter provided, that the other spouse: . . . .

"(f) Shall have offered such indignities to the person of the injured and innocent spouse, as to render his or her condition intolerable and life burdensome . . . ." As pointed out by Judge SPAETH, " . . . the Pennsylvania Supreme Court in its decisions defining indignities has never stated that either hate or estrangement, much less both, are central to a charge of indignities. Instead, echoing the statute, the Supreme Court has held that " '[t]he *essential feature* of the offense of indignities to the person is that it must consist of a course of conduct or continued treatment which renders the condition of the innocent party intolerable and his or her life burdensome. . . . ' *Phipps v. Phipps,* 368 Pa. 291, 295, 81 A.2d 523, 525 (1951), *cert. den.* 342 U.S. 942, 72 S.Ct. 554, 96 L.Ed. 701 (Emphasis supplied.)" *Steinke v. Steinke,* 238 Pa.Super. 74, 86, 357 A.2d 674, 680 (1975) (concurring opinion by Spaeth, J.). The concept of indignities lends itself poorly to precise definition.

2. Supra, n. 1.

*May v. May,* 62 Pa. 206 (1869),[3] but generally, "[w]hat is meant by such indignities is left undefined in the law, and depends largely upon the circumstances of each case; they must consist of such a course of conduct as is humiliating, degrading and inconsistent with the position and relations as a spouse." *McKrell v. McKrell,* 352 Pa. 173, 180, 42 A.2d 609, 612 (1945). Further, as pointed out in *Dougherty v. Dougherty,* 235 Pa.Super. 122, 131, 339 A. 2d 81, 86 (1975), we must view all acts complained of collectively to determine the sufficiency of a party's allegations.

Although we must exercise de novo review of the record, we must accord great weight to findings of the master in matters necessarily resolved by personal observations. See *Dougherty v. Dougherty,* supra; *Gehris v. Gehris,* 233 Pa.Super. 144, 334 A.2d 753 (1975); *Del-Vecchio v. DelVecchio,* 169 Pa.Super. 617, 84 A.2d 261 (1951). Thus, based on the master's findings, the issue of sufficiency is whether appellee's repeated false accusations of adultery, her unjustified charges that appellant suffered from venereal disease, her name-calling and verbal condemnation in front of friends and family, and long periods of time during which appellee refused to speak to appellant amounted to indignities. I have no difficulty in finding that appellee's actions constituted indignities " . . . [indignities] may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, . . .." *Breene v. Breene,* 76 Pa.Super. 568, 572 (1921). See also, *Steinke v. Steinke,* supra; II Freedman, Law of Marriage and Divorce in Pennsylvania, § 306 (2d Ed. 1957).

---

3. See, e. g., *Crawford v. Crawford,* 64 Pa.Super. 30, 33, (1916): "What acts or course of conduct will amount to such indignities as will justify the court in making a decree of divorce, seems to be nowhere defined and perhaps they are incapable of specification or exact definition."

In addition, the lower court apparently did not believe that appellant was an innocent and injured spouse. The only support for its position was that " . . . it appears that [appellee] weathered the storms early in the marriage with respect to outrageous conditions on her husband's part and that more recently it is the husband who has been called upon to accept a situation which could be described at best as something less than a satisfactory marriage." As indicated by the lower court, appellant's outrageous conduct occurred several years prior to the parties' separation. Had appellee sought a divorce instead of appellant, her acceptance of his conduct seven years prior to the action may have been a bar to her cause. See, e. g., *Garroway v. Garroway,* 361 Pa. 464, 65 A.2d 414 (1949). In contrast, appellee testified only to remote acts and did not attempt to prove that her conduct was the result of appellant's actions. Undoubtedly, appellant was not blameless. However, our law does not require that a party seeking a divorce be entirely free from all fault; the party must show that he or she did not evoke the conduct constituting indignities. *Gray v. Gray,* 220 Pa.Super. 143, 286 A.2d 684 (1971); *Eifert v. Eifert,* 219 Pa.Super. 373, 281 A.2d 657 (1971); *Margolis v. Margolis,* 201 Pa.Super. 129, 192 A.2d 228 (1963) The evidence does not support a conclusion that appellant was not the innocent and injured spouse.

Therefore, I would reverse and order appellant's complaint in divorce reinstated.

WATKINS, President Judge, joins in this dissenting opinion.

SPAETH, Judge, dissenting:

I cannot agree with the majority's statement that "it is our duty to make a plenary review," in the course of which we must consider the evidence de novo. Majority opinion at 1316. To the contrary, where, as here, the case turns on credibility, we must give "the fullest con-

278

sideration" to the master's findings. This means that if in a given case, we conclude to reject those findings, we should explain in detail the basis of our rejection. *See* my dissenting opinion in *Coxe v. Coxe*, 246 Pa.Super. 231, 369 A.2d 1297 (1976). Here the majority has given no reason for rejecting the master's findings, and I find none. Accepting the master's findings. I agree with Judge HOFFMAN that as a matter of law they make out a case of indignities.

I would reverse.