J-A11001-25          2025 PA Super 111

| | | |
|---|---|---|
| RUSSEL J. LAYTON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICOLE K. LAYTON | : | |
| | : | |
| Appellant | : | No. 1330 MDA 2024 |

Appeal from the Decree Entered August 21, 2024
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2019-CV-2281-DV

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY MURRAY, J.:                    **FILED MAY 23, 2025**

Nicole K. Layton (Wife) appeals from the August 21, 2024, amended divorce decree, which incorporated the terms of a prenuptial agreement between Wife and Russel J. Layton (Husband).  Wife challenges the trial court's December 5, 2023, order, which denied her motion to declare the prenuptial agreement invalid.  After careful review, we vacate the decree and the December 5, 2023, order, and remand for further proceedings.

The parties married on October 12, 2008, and Husband filed a complaint in divorce on March 28, 2019.  Husband alleged, *inter alia*, that the parties had executed a prenuptial agreement on October 10, 2008 (prenuptial agreement or the agreement).  On February 7, 2022, Wife filed a petition raising claims for, *inter alia*, equitable distribution and alimony.  On the same

_____

[*] Former Justice specially assigned to the Superior Court.

date, Wife filed a motion for declaratory judgment, asking the trial court to declare the prenuptial agreement invalid. The trial court assigned the motion to a divorce hearing officer (DHO).

On September 28, 2022, the DHO held an evidentiary hearing on the motion, at which Husband, Wife, and Wife's mother testified. On May 5, 2023, the DHO filed a report and recommendation (R&R). In the R&R, the DHO made detailed factual findings and credibility determinations. *See* R&R, 5/5/23, at 2-6, 8-13, 19, 25. The DHO's factual findings included the following:

1. [Wife is] an adult individual presently residing … [in] Davenport, Florida. N.T., 9/28/22, at 8.

2. Wife was born in 1979 and is currently 44 years of age. Preliminary Conference Memorandum (PLC Memo), 6/14/22 (incorporated into the record at N.T., 9/28/22, at 6-7).

3. Wife is not employed. *Id.*

4. [Husband is] an adult individual presently residing … [in] Harrisburg, P[ennsylvania]. N.T., 9/28/22, at 106-07.

5. Husband was born in 1950 and is currently 73 years of age. PLC Memo.

6. Husband is self-employed and semi-retired. *Id.*

7. Wife first met Husband briefly when she was fourteen years of age[,] through a friend of a friend of Husband's son [from] Husband's previous marriage. N.T., 9/28/22, at 9-10.

8. Wife went into [juvenile] placement due to behavioral issues after she was fourteen[,] and was discharged when she was seventeen years of age and in high school. *Id.* at 17-18.

9. After her discharge, Wife telephoned Husband's place of business to speak with Husband's son. *Id.*

10. Husband answered the phone and the parties chatted. ***Id.***

11. Wife told Husband she had just gotten out of placement[,] and Husband told Wife he was separated from his second wife and needed help caring for four of his children. ***Id.***

12. Husband asked Wife to babysit, and she accepted. ***Id.*** at 18.

13. At first[,] Wife babysat only [on] random weekends. ***Id.***

14. After months of [Wife] babysitting for Husband, Husband asked Wife out to dinner[,] and after that the parties' relationship became intimate. ***Id.*** at 19.

15. Prior to Wife's eighteenth birthday, Wife moved into Husband's residence. ***Id.*** At the time, Wife was estranged from her parents. ***Id.*** at 28.

16. Wife became more and more involved in the care of Husband's children and in Husband's life and[,] as a result, ultimately dropped out of high school. ***Id.*** at 20-21.

17. Prior to their marriage, the parties had two children: a son born in 2001 and a daughter born in 2005. ***Id.*** at 28.

18. Approximately a year before the birth of the parties' first child, Wife had begun to reconcile with her mother. ***Id.*** at 28-29.

19. [The parties' marriage was Husband's third and Wife's first.] Husband's previous two marriages ended in divorce. PLC Memo.

20. Two days prior to their marriage, on October 10, 2008, while [the parties were] in their kitchen[,] Husband presented Wife with a prenuptial agreement for her signature. N.T., 9/28/22, at 29-30.

21. Prior to that date, Husband had never mentioned a prenuptial agreement. ***Id.*** at 32-33.

22. After Husband asked Wife to sign the agreement, Wife asked if she could read it and[,] although Husband responded in the affirmative, he would not let Wife remove the document from his hands. ***Id.*** at 33.

23. Wife did not understand the terminology in the first couple of pages of the document[,] so she asked Husband if she could have someone like her parents look at it[,] and Husband said no. *Id.*

24. After the parties argued about the agreement and Wife had gone upstairs, Husband came [upstairs] and indicated that they were going to have to leave and get the agreement notarized. *Id.* at 34.

25. At most, Wife had [only] been … allowed to look at three pages of the agreement. *Id.* Wife was not provided with the opportunity to read the entire agreement. *Id.* at 60.

26. Wife did not understand the importance of the document[,] and Husband did not explain the importance of the document[;] but rather[, Husband] told Wife that if she did not sign it[,] her parents would lose the $50,000 that they had spent on the impending wedding[,] which had been planned a year in advance. *Id.* at 35, 75, 76.

27. The parties then drove together in the same vehicle to a notary, who knew Husband, and executed the document. *Id.* at 36-37.

28. Wife felt pressured to sign the agreement. *Id.* at 62.

29. [Husband made] no financial disclosure … to Wife … of his property or financial obligations prior to the execution of the agreement.

30. Wife did not waive disclosure of Husband's property or financial obligations in writing prior to execution of the agreement.

31. Wife did not have adequate knowledge of Husband's property or financial obligations prior to the execution of the agreement.

32. The parties were married on October 12, 2008, in Dauphin County, Pennsylvania. *Id.* at 9.

33. After the parties' marriage, four more children were born of their marriage. *Id.* at 61.

R&R, 5/5/23, at 2-5 (record citations and some capitalization modified).

Regarding the parties' credibility, the DHO stated as follows:

- 4 -

Wife was the more credible of the parties. Wife testified that during the marriage Husband, on occasion, physically abused her and verbally abused her by calling her names such as slut and whore. N.T., 9/28/22, at 24. Husband's testimony at [the] hearing implying that Wife had had sexual relations not only with his sons [from his prior marriage] and his mechanic but also with one of his prior attorneys, certainly bolsters Wife's testimony as to Husband expressing his negative impression of Wife. *Id.* at 107-08. Husband attempted to impeach Wife's credibility by pointing out that Wife had, at Husband's second wife's request, executed an affidavit averring that she and Husband [had] engaged in sexual relations prior to her eighteenth birthday[,] but then [Wife later] retracted the statement. While Wife admitted to signing the affidavit because she did not know she "wasn't … supposed to tell the truth[,]" and then retracting it, she also testified credibly that she retracted the statement only when Husband asked her to do so. *Id.* at 92-93. … The DHO believes Wife's explanation as to why she executed the affidavit in the first place and then retracted it at Husband's request. Wife readily admitted that she knew that Husband owned his home and his business prior to their marriage[,] and that he was able to freely provide her with cash to pay for [Wife's] and the children's expenses.

Husband first testified that Wife was aware of his financial wherewithal because she attended every divorce hearing in his prior divorce proceeding with his second wife. *Id.* at 117, 123. Later in his testimony, Husband walked back his testimony somewhat by indic[a]ting that Wife did not attend the master's hearings in his previous divorce. *Id.* at 170. Wife testified that while she attended Husband's custody proceedings with his second wife, given that she was a caretaker to the children involved in that proceeding, … [Wife] never attended his divorce hearings. *Id.* at 23, 114. At the hearing, the DHO advised that she was going to take judicial notice of the custody and divorce dockets in regard to Husband's custody and divorce proceedings with his second wife[, in order] to ascertain which proceedings Wife participated in during that time. *Id.* at 174. The [parties'] attorneys agreed with the DHO's taking judicial notice in this manner. *Id.* A review of those dockets evidence that Wife's testimony is correct.

R&R, 5/5/23, at 5-6 (record citations modified); *see also id.* at 6-7 (DHO finding Wife's mother "credibly testified that while she did do some data entry work for Husband's business during the [parties'] marriage …, she did not have access to financial documents concerning Husband's business.").

The DHO made additional factual findings and credibility determinations in the course of the R&R's legal analysis. *See id.* at 8-13, 19, 25. The DHO recommended that the trial court declare the prenuptial agreement invalid on two separate grounds: (1) that Wife was not provided with a fair and reasonable disclosure of Husband's finances, did not waive her right to such a disclosure, and did not have adequate knowledge of Husband's finances before executing the agreement; and (2) Wife signed the agreement under duress because she was denied the opportunity to consult with counsel. *Id.* at 11-12, 24.

Husband filed timely exceptions to the R&R. On December 5, 2023, after briefing and oral argument—**but without an additional evidentiary hearing**—the trial court granted Husband's exceptions in part and determined the prenuptial agreement "will not be invalidated or held to be unenforceable." Decision and Order, 12/5/23, at 5 (unpaginated). The trial court stated that it

> **is well acquainted with the parties[,] who have appeared before the court on multiple occasions over the course of several years in custody proceedings. While the court gives great deference to the DHO's credibility determinations and [the DHO's] well-considered and thoroughly cited report, <u>the court has had reasons to</u>**

**question the credibility of both parties over the years. Both Husband and Wife have become well-practiced in playing the role of victim and raising issues that lack corroboration or are mainly personal attacks.**

*Id.* at 2 (emphasis added).

Significantly, the trial court did not set forth its own factual findings and did not make specific credibility determinations as to the parties' testimony regarding the circumstances surrounding the agreement's execution. *See generally id.* The trial court did not clearly adopt any of the DHO's findings, **did not cite the hearing transcript**, and made only a few statements which could be interpreted as factual findings. *See generally id.*; *see also id.* at 2 ("Wife admitted that she read the first few pages of the prenuptial agreement."), 3 ("Given that the parties resided together for years before the execution of the [agreement], Wife had at least a general knowledge of Husband's assets, including his real estate, business, and vehicles."). In discussing the disclosure and duress issues, the trial court focused primarily on the prenuptial agreement's language, without significant reference to the circumstances of its execution. *See id.* at 2-5. In conclusion, the trial court stated:

> **The court does not make a finding that Husband is credible in his assertions.** However, the burden falls upon Wife to establish that she executed the prenuptial agreement under duress or without full disclosure, and the court finds that Wife has failed to meet that burden.

*Id.* at 5 (emphasis added).

On December 15, 2023, the trial court entered an order revoking the DHO's appointment, dismissing Wife's economic claims with prejudice, and directing Husband to file the documents necessary to facilitate the entry of a divorce decree that incorporated the terms of the prenuptial agreement. **See** Order, 12/15/23. Following procedure not relevant to this appeal, on August 21, 2024, the trial court entered an amended divorce decree, incorporating the terms of the prenuptial agreement.

Wife timely appealed. Wife filed a timely Pa.R.A.P. 1925(b) concise statement, and trial court filed an opinion under Pa.R.A.P. 1925(a). The trial court's Rule 1925(a) opinion primarily relied on its December 5, 2023, Decision and Order, and did not set forth additional factual findings. **See generally** Rule 1925(a) Opinion, 7/2/24.

Wife presents the following issue for our review: "Whether the trial court erred and/or abused its discretion in upholding the parties' prenuptial agreement?" Wife's Brief at 5 (capitalization modified). In three subsidiary issues, Wife argues the trial court erred or abused its discretion in (1) failing to invalidate the agreement for lack of proper disclosure of Husband's finances, **id.** at 17-22; (2) failing to invalidate the agreement as being executed under duress, **id.** at 23-27; and (3) setting aside the DHO's factual findings and credibility determinations, **id.** at 27-32.

> Prenuptial agreements
>
> are subject to contract principles. In determining whether the trial court properly applied contract principles, the reviewing Court

- 8 -

must decide, based on all the evidence, whether the trial court committed an error of law or abuse of discretion.

*Lewis v. Lewis*, 234 A.3d 706, 711 (Pa. Super. 2020) (citations and quotation marks omitted). An abuse of discretion

is synonymous with a failure to exercise a sound, reasonable, and legal discretion. It is a strict legal term indicating that an appellate court is of the opinion that there was commission of an error of law by the trial court.

*Id.* (citation omitted). "In conducting appellate review, we will not usurp the trial court's fact-finding function. To the extent that we must decide a question of law, however, our standard of review is *de novo*, and our scope of review is plenary." *Id.* (citations, quotation marks, and brackets omitted).

Challenges to the enforceability of prenuptial agreements are governed by 23 Pa.C.S.A. § 3106(a), which provides as follows:

**(a) General rule.--**The burden of proof to set aside a premarital agreement shall be upon the party alleging the agreement to be unenforceable. A premarital agreement shall not be enforceable if the party seeking to set aside the agreement proves, by clear and convincing evidence, that:

**(1)** the party did not execute the agreement voluntarily; or

**(2)** the party, before execution of the agreement:

**(i)** was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

**(ii)** did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

**(iii)** did not have an adequate knowledge of the property or financial obligations of the other party.

23 Pa.C.S.A. § 3106(a). Enacted in 2004, Section 3106(a) "is modeled after section 6(a) of the Uniform Premarital Agreement Act and encompasses the approach of **Simeone** [**v. Simeone**, 581 A.2d 162 (Pa. 1990)]." **Id.**, cmt.

> In **Simeone** …, our Supreme Court clarified the standards for determining the validity of [prenuptial] agreements and abolished the prior paternalistic approach to enforcement. The [Supreme] Court announced that "[a]bsent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." [**Simeone**, 581 A.2d] at 165. As the venerable Joann Ross Wilder, Esquire, couched the concept in Pennsylvania Family Practice and Procedure 5th, 2002 at 96, "Parties are free to enter into bargains they later regret, and bad deals are as enforceable as good ones provided the agreement is free of fraud or duress."

> … [T]he **Simeone** Court admonished, "If an agreement provides that full disclosure [of assets] has been made, a presumption of full disclosure arises." [**Simeone**, 581 A.2d] at 167. Likewise, the Court explained, "If a spouse attempts to rebut this presumption through an assertion of fraud or misrepresentation then this presumption can be rebutted if it is proven by clear and convincing evidence." **Id.** Thus, "Absent fraud, misrepresentation or duress, spouses should be held to the terms of their agreements." **Lugg** [**v. Lugg**, 64 A.3d 1109,] 1112 [(Pa. Super. 2013)]; [**see also**] **Stoner v. Stoner**, 572 Pa. 665, 819 A.2d 529, 533 (2003) (expressly rejecting approach which allows court to inquire into reasonableness of parties' bargain). This Court subsequently explained, "an agreement is valid even if it does not contain financial disclosure itself and can be upheld if it merely recites that such disclosure has been made." **Paroly v. Paroly**, 876 A.2d 1061, 1066 (Pa. Super. 2005). Indeed, "a full and fair disclosure in the property settlement agreement merely requires sufficient disclosure to allow the intended party to make an informed decision." **Busch v. Busch**, 732 A.2d 1274, 1278 n.5 (Pa. Super. 1999).

**Bennett v. Bennett**, 168 A.3d 238, 245-46 (Pa. Super. 2017).

Our Supreme Court has described duress as

that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness. The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause he is weak or infirm. Where persons deal with each other on equal terms and at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness. Moreover, in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel.

**Lewis**, 234 A.3d at 715 (quoting **Carrier v. William Penn Broadcasting Co.**, 233 A.2d 519, 521 (Pa. 1967)); **see also Simeone**, 581 A.2d at 167 (citing **Carrier**, 233 A.2d at 521). "Whether the facts found by the trial court constitute duress as a matter of law is a purely legal question for which our scope of review is plenary, and our standard of review is *de novo*." **Lewis**, 234 A.3d at 715 (citing **Stoner**, 819 A.2d 529).

The **Lewis** Court observed that, prior to its own decision, its

review of the relevant Pennsylvania case law [disclosed that] no spouse ha[d] ever convinced a court to void a [marital] settlement agreement on grounds of duress. There have been many instances where the party claiming duress suffered unseemly pressures to sign an agreement, but in each case, the courts concluded that those pressures did not constitute duress in the legal sense. For instance, in **Simeone, supra**, the claimant alleged she was forced to sign a prenuptial agreement on the eve of her wedding, "a time when she could not seek counsel without the trauma, expense, and embarrassment of postponing the wedding." **Id.**, 581 A.2d at 167. Likewise, in **Hamilton v. Hamilton**, … 591 A.2d 720, 722 ([Pa. Super.] 1991), the claimant alleged she was told that without a prenuptial agreement, there would be no wedding, notwithstanding the fact that "she was pregnant, unemployed, and probably frightened." In **Lugg**[, 64 A.3d at 1113-14], we concluded that "[d]aily badgering and one and one-half hours of 'pressure and negotiations' does not rise to the level of coercion necessary to find duress."

- 11 -

… In **Adams** [**v. Adams**, 848 A.2d 991 (Pa. Super. 2004)], a wife alleged she entered her marriage settlement agreement under duress. The trial court denied her claim. On appeal, the wife argued "the court failed to recognize her low self-esteem, dominance by an abusive husband, fear of the judicial system, treatment for attention deficit disorder, and alcoholism as evidence of her incapacity to assent." [**Id.**] at 993. We disagreed and affirmed the trial court.

**Lewis**, 234 A.3d at 715.

In **Lewis**, this Court affirmed the trial court's order invalidating a postnuptial agreement on grounds of duress. We summarized the complex facts as follows:

In December 2016, following [Mr. Lewis]'s extensive abuse, including his manipulation of [Ms. Lewis]'s mental health and medication, [Ms. Lewis] attempted suicide. While she recovered in a psychiatric hospital, [Mr. Lewis] broached the idea of her signing a [postnuptial] settlement agreement, which he assured her was simply a paper trail he needed to show his employer (the federal government) that he was separated from his "crazy wife," or else his security clearance would be jeopardized.

[Ms. Lewis] was released from the hospital before Christmas 2016, but her mental and physical state did not improve. [Mr. Lewis] continued dispensing [her] medication to make her feel nauseous and apathetic. On January 10, 2017, [Ms. Lewis] met with her psychiatrist to change her medication. Still, the medication's side effects remained unbearable, so three days later, on [the] morning of January 13, 2017, [she] went back to the psychiatrist. [Mr. Lewis] forced his attendance at these psychiatry appointments.

According to [Ms. Lewis], when the parties returned to their car after the second appointment, [Mr. Lewis] gave her the settlement agreement. He allowed [her] ten minutes to review it as he drove her to a notary public. [Mr. Lewis] reiterated that the settlement agreement was simply a paper trail he needed for work and that they would not divorce. When [Ms. Lewis] told him she did not feel comfortable signing anything without consulting an attorney, [he] responded, "If you dare get a lawyer, I'm divorcing

- 12 -

you and you will never see your daughter again." [Ms. Lewis] said she believed this threat, because in the past, [Mr. Lewis] inflicted punishments when she disobeyed him.

While [Mr. Lewis] waited in the car, [Ms. Lewis] had the agreement notarized by … an acquaintance of [Mr. Lewis]. [Mr. Lewis] told [Ms. Lewis] he could not come into the notary's office with her, or else it would look like he was forcing her to sign it. After [Ms. Lewis] had her signature notarized, the parties drove to [Mr. Lewis]'s counsel, where he had his signature notarized while [Ms. Lewis] waited in the car. The parties then returned home. [Ms. Lewis] claimed she did not read the January 13, 2017[,] settlement agreement before she signed it. [Ms. Lewis] asked [Mr. Lewis] for a copy, but he refused to provide one.

*Id.* at 709-10; *see also id.* at 715-16 (noting Ms. Lewis's testimony that Mr. Lewis physically abused her, and frequently punished her by locking her out of the house and forcing her to sleep on the porch).

The ***Lewis*** Court determined Ms. Lewis had proven duress:

Given [Mr. Lewis]'s infliction of systematic mental and physical abuse, and given the side effects of the unnecessary medication that [Mr. Lewis] controlled, we conclude [Ms. Lewis] rebutted the presumption that she possessed ordinary firmness at the time she signed the settlement agreement. Thus, the [trial] court properly considered [Ms. Lewis]'s individual state of mind. Likewise, we consider this finding to determine whether [Ms. Lewis] met the legal definition of duress; *i.e.*, [Ms. Lewis]'s ability to overcome the degree of restraint and danger [Mr. Lewis] imposed on her.

When [Ms. Lewis] signed the settlement agreement, she faced both impending physical danger, and [Mr. Lewis]'s explicit threat that she would never see her child again unless she signed it. The physical danger and the explicit threat operated as a restraint of [Ms. Lewis]'s free will. Because [Mr. Lewis] had followed through with his threatened punishments before, including his improper use of the legal system to obtain sole custody [of the parties' child], these threats caused [Ms. Lewis] apprehension. Moreover, [Ms. Lewis] was in a mentally and physically weakened state to resist this restraint and danger, due to the unnecessary medications [Mr. Lewis] gave her. In short,

- 13 -

the degree of threatened restraint and impending danger was sufficient in severity and apprehension to overcome [Ms. Lewis]'s personal state of mind.

*Id.* at 718-19.

The *Lewis* Court further determined that even if Ms. Lewis had not been threatened with bodily harm, she still established duress because "she did not have the opportunity to consult with counsel." *Id.* at 719; *see also id.* ("In our case law, the duress claimant's ability to consult with an attorney has often proved to be fatal to the claim. No matter how reprehensible the negotiation tactics were, if the claimant was able to consult with an attorney, the danger or restraint could not have been sufficiently severe to constitute legal duress."). Mr. Lewis argued Ms. Lewis had the opportunity to consult with counsel, contending he presented her with a draft copy of the settlement agreement in August 2016, five months before the parties eventually signed it. *See id.*; *see also id.* at 720 (observing that "the opportunity to consult an attorney may occur long before a proposed agreement is ever reduced to writing." (citing *Simeone v. Simeone*, 551 A.2d 219, 225 (Pa. Super. 1988), *affirmed*, 581 A.2d 162 (Pa. 1990)). This Court observed that whether Ms. Lewis "had the opportunity to seek counsel turns on the credibility of the witnesses." *Id.* at 720. The trial court credited Ms. Lewis's testimony over Mr. Lewis's, and found that the papers Mr. Lewis gave Ms. Lewis in August 2016 did not include a draft settlement agreement. *See id.* This Court

declined "to usurp the trial court's fact-finding function and reweigh the testimony…." *Id.* (citation and quotation marks omitted).

Instantly, Wife argues the trial court erred or abused its discretion in failing to invalidate the prenuptial agreement for lack of proper disclosure and, separately, execution under duress. *See* Wife's Brief at 17-27. Wife's argument relies primarily on the facts found by the DHO. *See generally id.*

In arguing Wife failed to establish lack of disclosure or duress, Husband relies primarily on his own version of events, which the DHO largely discredited and the trial court declined to adopt. *See generally* Husband's Brief. Husband particularly highlights his claim that the parties met with Husband's attorney months before their wedding to review the proposed agreement, and Wife was satisfied with its terms. *Id.* at 1-2; *but see* Wife's Brief at 24 (noting the DHO "found as fact that Husband had never mentioned the Prenuptial Agreement to Wife until two days before their wedding.").

Our review discloses the parties have been constrained to espouse contradictory facts on appeal because the trial court did not set forth its own factual findings, or make specific credibility determinations as to the parties' testimony regarding the circumstances surrounding the prenuptial agreement's execution. *See generally* Decision and Order, 12/5/23; Rule 1925(a) Opinion, 7/2/24. The trial court found both parties' credibility questionable, but only referenced each party's tendency to play the victim and make uncorroborated assertions in prior custody proceedings before the trial

- 15 -

court.  **See** Decision and Order, 12/5/23, at 2.  We cannot discern which portions of the parties' testimony regarding the agreement, if any, the trial court considered credible.  The DHO's detailed factual findings rested heavily on the DHO's determination that Wife's testimony was largely credible.  The trial court's abrogation of that credibility determination essentially abrogated the DHO's factual findings.  But the trial court failed to substitute any substantial findings of its own.  On appeal, therefore, we are left with a factual record that consists almost exclusively of the testimony of two witnesses, both of whom the trial court deemed incredible, but only in a vague, general sense.  The parties both testified that Wife signed the agreement on October 10, 2008, but agreed on little else.  Without specific factual findings and credibility determinations, we cannot discern the facts underlying the trial court's decision and, apparently, neither can the parties.

For this reason, we cannot meaningfully review the trial court's determination that Wife failed to meet her burden of proving lack of disclosure or duress.  The trial court rendered legal conclusions regarding these issues, but we cannot determine whether the facts support those conclusions.  We therefore do not reach the merits of the disclosure or duress issues.

In her third sub-issue, Wife argues the trial court erred or abused its discretion in setting aside the DHO's credibility determinations.  **See** Wife's Brief at 27-32.  We agree in part, and determine the trial court abused its discretion in setting aside the DHO's factual findings and credibility

determinations **without rendering its own factual findings or specific credibility determinations**.

Section 3321 of the Divorce Code provides that "[t]he court may appoint a master to hear testimony on all or some issues, except issues of custody and paternity, and return the record and a transcript of the testimony together with a report and recommendation as prescribed by general rules…." 23 Pa.C.S.A. § 3321. Pennsylvania Rule of Civil Procedure 1920.53 provides that, "[i]n an action for divorce or annulment that has been referred to a hearing officer, the hearing officer's report and recommendation shall include findings of fact, conclusions of law, and a recommended disposition of the case or issue." Pa.R.C.P. 1920.53.[1]

We have observed that, "in determining issues of credibility[,] the master's findings must be given the fullest consideration[,] for it was the [m]aster who observed and heard the testimony and demeanor of various witnesses." *Anderson v. Anderson*, 822 A.2d 824, 830 (Pa. Super. 2003). However,

> [t]he issue of credibility of witnesses in a divorce case is not entirely to be resolved by the [m]aster. The [trial] court has the duty to make a complete and independent review of all the evidence presented in a divorce action. This includes a complete review of the weight and credibility to be accorded to the testimony of the witnesses. *Riley v. Riley*, 369 A.2d 1314 (Pa. Super. 1976). The reviewing court must examine the record in detail so as to discover inherent improbabilities in the stories of

---

[1] In 2021, amendments to the civil rules substituted "hearing officer" for "master." We use the terms interchangeably.

the witnesses, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehoods, and other factors by which credibility may be ascertained. *Ryave v. Ryave*, 375 A.2d 766 (Pa. Super. 1977).

*Rollman v. Rollman*, 421 A.2d 755, 758 (Pa. Super. 1980) (citations modified); *see also Buckl v. Buckl*, 542 A.2d 65, 68 (Pa. Super. 1988) (in cases involving a master, "[i]t is the duty of the [trial] court to perform a complete and independent review of all the evidence presented in the action.")

> In general, a trial court examining the factual findings of a master … may use a broad scope of review, but great weight must nevertheless be accorded to the findings of the master … where issues of credibility must necessarily be resolved by personal observation. *Barton*, 375 A.2d 96. Therefore, although the findings of fact and the recommendations of the [m]aster are usually considered as only advisory, an exception is made where the issue is one of credibility and the master is the one who heard and observed the witnesses. In that situation, the findings of the master should be given the fullest consideration. *DeBias v. DeBias*, 369 A.2d 396 (Pa. Super. 1976); *Schrock v. Schrock*, 359 A.2d 435 (Pa. Super. 1976); *Gehris v. Gehris*, 334 A.2d 753 (Pa. Super. 1975). This is not to say that the master's conclusions regarding credibility are binding on the [trial] court, but where the record alone does not indicate which party's testimony should be credited, the determination of the master can tip the balance.

*Mintz v. Mintz*, 392 A.2d 747, 749 (Pa. Super. 1978) (citations modified).

Instantly, Wife argues the trial court did not give the DHO's credibility determinations

> the fullest consideration. The [trial court's] observations as to credibility were based upon [its] observations [of] the parties during their custody proceeding[. The trial court] did not have the opportunity to observe the parties during their hearing in front of the [DHO]. The [trial court] did not cite specific portions of the transcript to explain why, based upon the record in this divorce action, it was appropriate to set aside the credibility determinations of the [DHO].

Wife's Brief at 30. Wife additionally argues, without citing authority, that the trial court's "observations of the parties in prior custody proceedings are not transferrable to the divorce matter[,] and cannot be used as justification for setting aside the [DHO's] credibility determinations." *Id.* at 31. Husband maintains the trial court "thoughtfully reviewed the [R&R], overturning it in a judiciously and carefully articulated Decision and Order." Husband's Brief at 11.

We agree with Wife that the trial court abused its discretion in failing to cite specific portions of the hearing transcript or adequately explain why it set aside the DHO's credibility determinations.[2] We note that the trial court is not bound by the DHO's factual findings or credibility determinations, and has a duty to independently review the record. *See Rollman*, 421 A.2d at 758. However, to the extent the trial court discards the DHO's factual findings and credibility determinations, we determine it must not only explain why it did

---

[2] After stating that it "has had reasons to question the credibility of both parties over the years," the trial court indicated "that matters such as the failure of the parties to execute the prenuptial agreement at the attorney's office and the likelihood that Husband knew the notary are not sufficient to establish Wife's credibility." Decision and Order, 12/5/23, at 2. Our review discloses the DHO's credibility determinations were based on many, many more facts and circumstances than the two the trial court mentioned here. *See* R&R, 5/5/23, at 5-6, 8-13, 19, 25. The trial court did not address the multiple other bases for the DHO's credibility determinations and did not express its own opinion on those facts and circumstances. Moreover, we cannot discern, from the trial court's reference to the parties' failure to execute the agreement at the attorney's office, whether the trial court believed the parties actually visited the attorney's office to discuss the agreement—a point on which the parties vigorously disagree.

so, but also set forth its own factual findings and specific credibility determinations. We observe that resolving a challenge to the enforceability of a marital settlement agreement is often a fact-intensive inquiry. *See*, *e.g.*, *Lewis*, 234 A.3d at 710 (citing 45-page trial court opinion). We further observe that while this Court is "bound by the trial court's credibility determinations" and "does not … mak[e] independent factual determinations," we "**are not bound by the trial court's deductions or inferences from its factual findings**." *Id.* (citations omitted; emphasis added). Here, the trial court did not set forth its factual findings, and left us with little more than the deductions and inferences it derived from some undisclosed body of facts.

Wife's brief does not suggest a remedy for the trial court's error in setting aside the DHO's credibility determinations. *See* Wife's Brief at 27-32. In *Mintz*, where the trial court disregarded the master's credibility determinations in a conclusory manner, we reversed the trial court and directed "that the master's recommendation be followed…." 392 A.2d at 194. Here, Wife does not urge us to order the DHO's R&R be followed, and we decline to apply such a drastic remedy. Rather, we vacate the trial court's decision on Wife's motion for declaratory judgment and remand for further proceedings.

On remand, we direct the trial court to make detailed factual findings and specific credibility determinations regarding all of the circumstances surrounding the agreement's execution, and any other circumstances bearing

on the parties' credibility. If necessary, the trial court may order additional hearings. Though we refrain from quoting it at length, we note that the DHO's R&R made many factual findings and credibility determinations in addition to those set forth above. *See* R&R, 5/5/23, at 8-13, 19, 25. While we reiterate that the trial court is not bound by the R&R, we expect its own decision to be similarly detailed.[3]

In fashioning this remedy, we are mindful that while the trial court did not observe the parties' testimony regarding the prenuptial agreement, the court was familiar with the parties from their prior custody proceedings. Indeed, the trial court may have been substantially more familiar with the parties than the DHO was, and we presume the court did not discard the DHO's credibility determinations lightly. Nevertheless, we stress that the trial court must make specific credibility determinations regarding the parties' sharply differing accounts of the circumstances surrounding the agreement's execution. Though we do not agree with Wife that the trial court's familiarity with the parties from their custody proceedings cannot inform its views in the instant matter,[4] we emphasize that the trial court must be specific regarding

_____

[3] Because we do not reach the merits of the disclosure or duress issues, we express no opinion as to which facts may be dispositive. We further express no opinion as to whether the record supports the DHO's factual findings, credibility determinations, or legal conclusions.

[4] In *Lewis*, the husband argued the trial court "had an implicit bias in the [postnuptial agreement] matter after having previously adjudicated the
*(Footnote Continued Next Page)*

- 21 -

its credibility determinations, and should provide details regarding any prior proceedings that may inform its views. In light of our decision, the trial court may deem it beneficial to hold a further evidentiary hearing.

For the reasons set forth above, we vacate the August 21, 2024, amended divorce decree and the December 5, 2023, order,[5] and remand this matter to the trial court for further proceedings consistent with this opinion.

_____

parties' prior cases, including [a previous Protection From Abuse] hearing, where the court made the rather remarkable credibility determination that [the h]usband 'was playing the system like a Stradivarius.'" *Lewis*, 234 A.3d at 721. This Court determined the husband waived the issue "because [he] did not seek the [trial] court's recusal prior to or even during the [postnuptial agreement] hearing." *Id.* We further noted that

> [w]e do not suggest that this trial court, or any court that presides over multiple family court cases, should automatically recuse when confronted with its prior credibility determinations. On this issue, we "recognize that our trial judges are honorable, fair and competent" and that "the judge himself [or herself] is best qualified to gauge his [or her] ability to preside impartially." *In re A.D.*, 93 A.3d 888, 893 (Pa. Super. 2014).

*Id.* at 721 n.5. Here, Wife did not seek the trial court's recusal, nor does she identify any authority suggesting that testimony in prior proceedings cannot inform a fact-finder's credibility determinations in a subsequent proceeding. We therefore conclude Wife has waived this aspect of her argument. *See Lewis*, 234 A.2d at 721; *see also Santander Bank, N.A. v. Ansorge*, 327 A.3d 259, 265 (Pa. Super. 2024) ("Failure to cite relevant legal authority constitutes waiver of the claim on appeal." (citation omitted)); Pa.R.A.P. 2119(a) (requiring discussion and citation of pertinent authorities).

[5] We also vacate the trial court's December 15, 2023, order, which purported to amend the December 5, 2023, order, dismissing Wife's economic claims as precluded by the prenuptial agreement. However, we do **not** vacate the portion of the December 15 order which revoked the DHO's appointment. We note that the August 21, 2024, amended divorce decree finalized the December 5 and 15 orders.

Decree and order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/23/2025